## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, AND POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT,** | |
| **Plaintiffs,** | Case No. |
| | Removed from: The State of Michigan Circuit Court for the County of Wayne Civil No. 10-010216-CK |
| **v.** | |
| **UBS, AG, UBS SECURITIES, LLC, and, UBS INVESTMENT BANK,** | **DEFENDANTS' NOTICE OF REMOVAL** |
| **Defendants.** | |

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN:

PLEASE TAKE NOTICE that Defendants UBS AG and UBS Securities, LLC (the "Removing Defendants"[1]) hereby remove Case No. 10-010216-CK, filed in the State of Michigan, Circuit Court for the County of Wayne, and all claims and causes therein, to the U.S. District Court for the Eastern District of Michigan, Southern Division.  As grounds for removal, the Removing Defendants state as follows:

### JURISDICTION

1.       This Court has removal jurisdiction over this case pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

---

[1] Plaintiffs also have sued "UBS Investment Bank."  UBS Investment Bank is not a separate entity, but rather a division within UBS AG.  To the extent that UBS Investment Bank is an appropriate entity for suit, which it is not, it also should be considered a Removing Defendant.

## INTRADISTRICT ASSIGNMENT

2.      This action is properly removable to this district and division because it was filed in the State of Michigan, Circuit Court for the County of Wayne.

## BASIS FOR REMOVAL

3.      On or about September 2, 2010, Plaintiffs General Retirement System of the City of Detroit and Police and Fire Retirement System of the City of Detroit ("Plaintiffs") filed a Summons and Complaint captioned *General Retirement System of the City of Detroit, and Police and Fire Retirement System of the City of Detroit v. UBS, AG, UBS Securities, LLC, and UBS Investment Bank*, Civil No. 10-010216-CK, in the State of Michigan, Circuit Court for the County of Wayne (the "State Court Action").

4.      Defendant UBS Securities, LLC, through its registered agent in Michigan, Corporation Service Company, was served with these documents via certified mail, which was received on or about September 7, 2010.  Defendant UBS AG, which is incorporated and has its principal place of business in Switzerland, received copies of these documents via certified mail to a branch office in Connecticut on or about September 15, 2010.

5.      Pursuant to 28 U.S.C. § 1446(a), copies of the Summons, Complaint and all process, pleadings, and orders served upon or otherwise received by the Removing Defendants are attached hereto as Exhibit A.

6.      This Notice of Removal is filed within thirty (30) days of receipt, through service or otherwise, of the Summons and Complaint, and it is, therefore, timely under 28 U.S.C. § 1446(b).

7.      No defendant has pled, answered, or otherwise appeared in the State Court Action.

8.      There are no defendants other than the Removing Defendants.  All defendants named and served in, or receiving notice of, this action consent to and join in the removal of this action.

## PLAINTIFFS' COMPLAINT IS REMOVABLE ON THE BASIS OF DIVERSITY JURISDICTION

9.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different States and in which a citizen of a foreign state is an additional party, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.

10.     Plaintiffs seek rescission of contracts worth a combined total of $40 million, in addition to damages.  *See* Compl. at p.28 (Prayer for Relief).  Thus, the alleged amount in controversy significantly exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).

11.     No defendant is a citizen of Michigan, the state in which this action was brought. UBS Securities, LLC is a limited liability company with two members, UBS Americas, Inc. and UBS AG, neither of which is a citizen of Michigan.  UBS Americas, Inc. is incorporated under the laws of Delaware with its principal place of business in Connecticut.  UBS AG is incorporated under the laws of Switzerland with its principal place of business in Switzerland. Accordingly, the Removing Defendants are citizens of Delaware, Connecticut, and Switzerland for purposes of diversity jurisdiction.  *See* 28 U.S.C. § 1332(c)(1). [2]

12.     Plaintiffs are citizens of Michigan.  Plaintiffs allege that they are "pension plan[s] and trust[s]" established by the Charter and Municipal Code of the City of Detroit, Michigan, with offices in Detroit, Michigan.  Compl. ¶¶ 31, 32.  Assuming that Plaintiffs are "trusts," they

---

[2] To the extent that UBS Investment Bank, which is a division of UBS AG, is an appropriate entity for suit, which it is not, UBS Investment Bank as a division of UBS AG would be a citizen of Switzerland.

are citizens of Michigan. A trust is a citizen of the state in which its trustee(s) are citizens. *See Homfeld II, L.L.C. v. Comair Holdings, Inc.*, 53 F. App'x 731, 732 (6th Cir. 2002) ("a business trust has the citizenship of its trustees") (attached as Exh. B hereto); *see also Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 901 (7th Cir. 2010) ("Assignment to a trust could be designed to take advantage of the rule that a trust's citizenship is that of the trustee, rather than the beneficiaries, for the purpose of 28 U.S.C. § 1332(a)."), *petition for cert. filed*, 79 U.S.L.W. 3109 (Aug. 16, 2010) (No. 10-232); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 n.6 (5th Cir. 2009) (citing *Navarro Savs. Ass'n v. Lee*, 446 U.S. 458, 464 (1980), for the proposition that "citizenship of a trust is that of its trustee"); *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) (in analyzing the citizenship of a limited liability company in which one member was a trust, the court stated that "[a] trust has the citizenship of its trustee or trustees"); *May Dep't Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 599 (7th Cir. 2002) ("The May [pension] plan is a trust, and for diversity purposes a trust is a citizen of whatever state the trustee is a citizen of."); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 931 (2d Cir. 1998) (citizenship of the trustee determines the citizenship of the trust for diversity jurisdiction).

13. Upon information and belief, the trustees of the General Retirement System of the City of Detroit are the following natural persons: Wendall Anthony, Alvin Brooks, David Clark, Cedric Cook, Susan Glaser, Cheryl Johnson, Sheila Kneeshaw, John Riehl, Saunteel Jenkins, and Kirk Lewis. Upon information and belief, each of these individuals is domiciled within Michigan and accordingly is a citizen of Michigan for diversity jurisdiction purposes.

14. Upon information and belief, the trustees of the Police and Fireman Retirement System of the City of Detroit are the following natural persons: Gregory Best, Janice Butler, Matthew Gnatek, Cheryl Johnson, James Moore, Sean Neary, Jeffrey Pegg, Paul Stewart, Brenda

Jones, Kirk Lewis, and James Mack.  Upon information and belief, each of these individuals is

domiciled within Michigan and accordingly is a citizen of Michigan for diversity jurisdiction

purposes.

15.     Diversity is also evidenced by positions Plaintiffs have taken in prior proceedings.

In *City of Detroit Pension Fund, City of Detroit Police & Fireman Pension Fund v. Prudential*

*Securities, Inc.*, 91 F.3d 26 (6th Cir. 1996), the Sixth Circuit examined the existence of federal

jurisdiction in a case brought in the Eastern District of Michigan by the City of Detroit Pension

Fund and the City of Detroit Police and Fireman Pension Fund which, upon information and

belief, are the same plaintiffs as in the current action.  The defendant in that case, Prudential

Securities, argued that the requirements of diversity jurisdiction under 28 U.S.C. § 1332 were

met because the plaintiffs "[were] Michigan corporations with their principal places of business

in Michigan" while the defendant was a Delaware corporation with its principal place of business

in New York.  *Id.* at 29.  Observing that, "[a]t oral argument, the [plaintiffs] admitted these

jurisdictional facts," and "given the agreement by the parties that the elements of diversity

jurisdiction are satisfied," *id.*, the court held:  "Because the parties are of diverse citizenship and

the requisite minimum amount is in controversy, the district court had jurisdiction under 28

U.S.C. § 1332." *Id.* at 30.

16.     In addition, in a recent case in the Eastern District of Michigan captioned *Police*

*& Fire Retirement System of the City of Detroit v. Watkins*, No. 2:08-cv-12582, 2008 WL

6512740 (E.D. Mich. Dec. 22, 2008) (attached as Exh. C hereto), Plaintiffs in the current action

alleged that subject matter jurisdiction was proper under 28 U.S.C. § 1332 based on diversity of

citizenship because no defendant named in that matter was a Michigan citizen.[3]  Plaintiffs

represented to the Eastern District of Michigan in *Watkins*, as they do here, that they are pension

plans and trusts established by the Charter and Municipal Code of the City of Detroit, Michigan,

with offices in Detroit, Michigan.  Plaintiffs asserted that jurisdiction based on diversity of

citizenship was present in *Watkins* as no defendant was a citizen of Michigan (although

defendants were citizens of Delaware, Alabama, Colorado, and Georgia).  Because Plaintiffs'

sole asserted basis for subject matter jurisdiction in *Watkins* was diversity of citizenship, and the

Eastern District of Michigan recently decided in Plaintiffs' favor in denying a motion to dismiss,

it is clear that the court adopted Plaintiffs' position by exercising federal diversity jurisdiction

over the *Watkins* case based on Plaintiffs' Michigan citizenship. *See Police & Fire Ret. Sys. of*

*the City of Detroit v. Watkins*, No. 2:08-cv-12582, 2010 WL 3325631 (E.D. Mich. Aug. 20,

2010) (attached as Exh. E hereto).

17.      Based on *Prudential Securities* and *Watkins,* Plaintiffs should be barred under the

doctrine of judicial estoppel from taking an inconsistent position in this case by denying diversity

jurisdiction or arguing that they are citizens of any state other than Michigan. *See Lorillard*

*Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008).

18.      Because Plaintiffs are citizens of Michigan and the Removing Defendants are not,

there is complete diversity and jurisdiction under 28 U.S.C. § 1332.  Because there is complete

diversity and the amount in controversy is greater than $75,000, this action is removable to this

Court pursuant to 28 U.S.C. § 1441.

---

[3] Similarly, in the Civil Cover Sheet filed by Plaintiffs in the Eastern District of Michigan in
connection with *Watkins*, Plaintiffs represented that the basis of federal jurisdiction was diversity
of citizenship.  When asked to identify the citizenship of the principal parties, Plaintiffs checked
the box for "Citizen of This State," i.e., Michigan, and indicated that the defendants were citizens
of another state (attached as Exh. D hereto).

## PROCEDURAL REQUIREMENTS

19.     The Removing Defendants will promptly serve a copy of this Notice of Removal on counsel for Plaintiffs and file with the Clerk of the Circuit Court for the County of Wayne, State of Michigan, a Notice of Filing of Removal pursuant to 28 U.S.C. § 1446(d).

20.     The Removing Defendants appear specially for purposes of removal only.  They expressly reserve all defenses, affirmative defenses and rights, including without limitation, defenses as to venue, jurisdiction, and other defenses, as well as affirmative defenses or rights under the Federal Rules of Civil Procedure, applicable statutes, or common law.  The Removing Defendants expressly reserve their rights to raise any such defenses or rights in response to either the current Complaint or any amended complaint that may be filed relating to this action.

WHEREFORE, the Removing Defendants pray that the above-captioned matter be removed from the State of Michigan, Circuit Court for the County of Wayne, to the U.S. District Court for the Eastern District of Michigan for the reasons stated above, or for any other reasons the Court deems necessary and proper.

Dated:  October 1, 2010

DYKEMA GOSSETT PLLC


By:     s/ Howard B. Iwrey
           Joseph H. Hickey (P41664)
           Howard B. Iwrey (P39635)
           Suite 300
           39577 Woodward Avenue
           Bloomfield Hills, MI  48304
           Telephone:  (248) 203-0700
           Facsimile:  (248) 203-0763
           Email: hiwrey@dykema.com

           Dane H. Butswinkas
           R. Hackney Wiegmann
           Thomas G. Ward
           Andrew W. Rudge
           Williams & Connolly LLP
           725 Twelfth Street, N.W.
           Washington, D.C.  20005
           Telephone:  (202) 434-5000
           Facsimile:  (202) 434-5029

           *Attorneys for Defendants*
           *UBS AG and*
           *UBS Securities LLC*

# EXHIBIT A

**STATE OF MICHIGAN**
**THIRD CIRCUIT COURT**



**CASE NO.** 10-010216-CK

## SUMMONS AND RETURN OF SERVICE

COURT
ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226

COURT
TELEPHONE NO. (313) 224-

THIS CASE ASSIGNED TO JUDGE: Prentis Edwards          Bar Number: 13114

PLAINTIFF

GENERAL RETIREMENT SYS OF THE CITY OF DET   VS

DEFENDANT

UBS AG

PLAINTIFF'S ATTORNEY

Miller, E. Powell
(P-39487)
950 W University Dr Ste 300
Rochester, MI 48307-1867
(248) 841-2200

| CASE FILING FEE | | JURY FEE | |
|---|---|---|---|
| Paid | | Paid | |
| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK | |
| 09/02/2010 | 12/02/2010 | Pamela Oliver | |

*This summons is invalid unless served on or before its expiration date.     Cathy M. Garrett – Wayne County Clerk

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

9/2/10
Date

Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)   MC 01 (10/97)   **SUMMONS AND RETURN OF SERVICE**   MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)

PLAINTIFF

| STATE OF MICHIGAN THIRD CIRCUIT COURT  | **SUMMONS AND RETURN OF SERVICE** | **CASE NO.** 10-010216-CK |
|---|---|---|

| COURT ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT TELEPHONE NO. (313) 224- |
|---|---|

THIS CASE ASSIGNED TO JUDGE:    Prentis Edwards                    Bar Number: 13114

| PLAINTIFF | DEFENDANT |
|---|---|
| GENERAL RETIREMENT SYS OF THE CITY OF DET    VS | UBS INVESTMENT BANK |

PLAINTIFF'S ATTORNEY

Miller, E. Powell
(P-39487)
950 W University Dr Ste 300
Rochester, MI 48307-1867
(248) 841-2200

| CASE FILING FEE | JURY FEE |
|---|---|
| Paid | Paid |

| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK |
|---|---|---|
| 09/02/2010 | 12/02/2010 | Pamela Oliver |
| *This summons is invalid unless served on or before its expiration date. | | Cathy M. Garrett – Wayne County Clerk |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer    pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

9/2/10
Date                                    Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)    MC 01 (10/97)    **SUMMONS AND RETURN OF SERVICE**                    MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)
PLAINTIFF

| STATE OF MICHIGAN<br>THIRD CIRCUIT COURT<br> | SUMMONS AND<br>RETURN OF SERVICE | CASE NO.<br>10-010216-CK |
|---|---|---|

| COURT<br>ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT<br>TELEPHONE NO. (313) 224- |
|---|---|

THIS CASE ASSIGNED TO JUDGE: **Prentis Edwards**          **Bar Number: 13114**

| PLAINTIFF | DEFENDANT |
|---|---|
| **GENERAL RETIREMENT SYS OF THE CITY OF DET   VS** | **UBS SECURITIES LLC** |

PLAINTIFF'S ATTORNEY

**Miller, E. Powell
(P-39487)
950 W University Dr Ste 300
Rochester, MI 48307-1887
(248)  841-2200**

| CASE FILING FEE<br>**Paid** | JURY FEE<br>**Paid** |
|---|---|
| ISSUED<br>**09/02/2010** | THIS SUMMONS EXPIRES<br>**12/02/2010** | DEPUTY COUNTY CLERK<br>**Pamela Oliver** |

*This summons is invalid unless served on or before its expiration date.      Cathy M. Garrett – Wayne County Clerk

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer   pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

Date **9/2/10**          Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)    MC 01 (10/97)    **SUMMONS AND RETURN OF SERVICE**    MCR 2.102(S)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)
DEFENDANT

**For best results use a felt pen**

| RETURN OF SERVICE | Case No. |
|---|---|

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NON-SERVICE

| ☐ **OFFICER CERTIFICATE** | **OR** | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party [MCR 2.104(A)(2)], and that:    (notary not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:    (notary required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
            List all documents served with the Summons and Complaint

_____

_____  on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ After diligent search and inquiry, I have been unable to find and serve the following defendant(s):

_____

I have made the following efforts in attempting to serve the defendant(s):_____

_____

☐ I have personally attempted to serve the summons and complaint, together with _____
                                                                            Attachment

_____  on _____
                                              Name

at _____ and have been unable to complete service because
   Address

the address was incorrect at the time of filing.

| Service fee | Miles traveled | Mileage fee | Total fee | Signature |
|---|---|---|---|---|
| $ | | $ | $ | |
| | | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                        Date

My commission expires: _____ Signature: _____
                        Date                        Deputy court clerk/Notary public

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                  Attachments

_____ on _____
                                      Day, date, time

                                      on behalf of _____

_____
Signature



## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, AND
POLICE AND FIRE RETIREMENT SYSTEM
OF THE CITY OF DETROIT,

     Plaintiffs,

v

UBS, AG, UBS SECURITIES, LLC, and,
UBS INVESTMENT BANK,

     Defendants.

GENERAL RETIREMENT SYS OF THE CIT
Hon. Prentis Edwards          09/02/2010

**10-010216-CK**

There is no other civil action arising out of the same
transaction or occurrence as alleged in the Complaint pending
in this court, nor has any such action been previously filed and
dismissed after having been assigned to a Judge.

*E. Powell Miller*

E. Powell Miller

**THE MILLER LAW FIRM, P.C.**
BY:   E. POWELL MILLER (P39487)
     MARC L. NEWMAN (P51393)
     DAVID H. FINK (P28235)
     CHRISTOPHER D. KAYE (P61918)
950 W. University Drive, Suite 300
Rochester, Michigan 48307
Tel:  (248) 841-2200
Fax: (248) 652-2852

**FLOYD E. ALLEN & ASSOCIATES, P.C.**
BY:   KEVIN J. CAMPBELL (P66367)
2500 Fisher Building
3011 W Grand Boulevard
Detroit, Michigan 48202
Tel:  (313) 871-5500
Fax:  (313) 871-0517

Attorneys for Plaintiffs

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, General Retirement System for the City of Detroit ("GRS"), and Police and Fire Retirement System for the City of Detroit ("PFRS"), through their attorneys, The Miller Law Firm, P.C., and Floyd E. Allen & Associates, P.C., for their Complaint and Demand for Jury Trial ("Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which investigation included, among other things, a review and analysis of: (1) public documents pertaining to Defendant UBS and its affiliates; (2) UBS' filings with the Securities and Exchange Commission ("SEC"); (3) press releases published by UBS; (4) analyst reports concerning UBS and its affiliates; (5) pleadings in other litigation where UBS is or was a party; (6) discussions with witnesses involved in the transaction; (7) documents provided by UBS; and (8) newspaper and magazine articles regarding UBS and its business.  Many of the facts supporting the allegations contained herein are known only to UBS and its affiliates or are exclusively within their custody and/or control.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for good faith discovery.

## SUMMARY AND BACKGROUND

1.     At the heart of this case is an extraordinarily complicated financial transaction, involving an investment by the Plaintiffs in a Collateralized Loan Obligation  masterminded by UBS (as more fully explained below), in which UBS defrauded the City of Detroit employee pension funds out of $40 million. Nonetheless, the issues surrounding how the investment came to be, and how $40 million of pensioner trust monies were ultimately lost, to the benefit of UBS alone, are surprisingly simple, and involve the sort of deception and self-dealing for which the claims pled herein offer redress.

2.      Essentially, UBS defrauded the Plaintiffs into investing $40 million in a complex investment vehicle, i.e., a CLO.  Unbeknownst to Plaintiffs, UBS created the CLO to transfer high risk assets from its own balance sheets to the CLO, and to unsuspecting investors like Plaintiffs.  Through aggressively fraudulent misrepresentations regarding the risk associated with an investment in the CLO, its ability to monitor and control risk, and its ability to complete the transaction, UBS obtained $40 million in pension funds from Plaintiffs. UBS repeatedly refused to complete the transaction, and ultimately liquidated the CLO collateral in contravention with its obligations, and with the exclusive purpose of taking Plaintiffs' $40 million investment for themselves.

3.      Thus, Plaintiffs' losses did not result from unforeseeable events, but from a deliberate scheme by UBS to deceive Plaintiffs into giving $40 million to UBS in exchange for high-risk assets which banks, like UBS, were seeking to unload on unsuspecting investors.

4.      The framework for the events leading up to this case took shape well before UBS defrauded the Plaintiffs to relinquish $40 million to a CLO.  It began in the early to mid-1980s, when improved technology and increasingly sophisticated investors enabled "asset 'securitization" in the capital markets to blossom.

5.      In general terms, securitization is the structured process whereby interests in loans and other receivables are packaged, underwritten, and sold in the form of "asset-backed" securities.  More specifically, the process involves transferring loans to an off-balance sheet "special purpose entity," structuring the loan portfolio into "tranches" with different degrees of risks and returns, and selling securities from each tranche.   Securitization is advantageous to investment banks, such as UBS, seeking to move their riskiest loans off their balance sheets.

3

6.      The structured tranches are typically arranged as follows: a senior (AAA) tranche in a first position, followed by a mezzanine (A) tranche, a subordinated (B) tranche, and finally an equity (unrated) tranche. The lower tranches are the riskiest, as they are the first to absorb losses generated from the underlying collateral portfolio, which results in reduced cash flow. The most senior tranches are the least risky, as they are less likely to have their cash flows affected by losses from the collateral portfolio.

7.      An underwriting investment bank, such as UBS, usually retains another firm to manage the loan portfolio, e.g., to replace those portfolio loans which have been paid off. However, the underwriting bank generally retains control over which loans are securitized, and when, if at all, the debt securities are offered for sale.

8.      At the offering, purchasers of the securities acquire the right to capture a spread between income earned on assets (the principal payments) and the interest paid on the financing of the loan portfolio, i.e., cash flow.

9.      The first wave of securitization involved primarily mortgages.   In time, as portfolio lenders became increasingly sophisticated, and the profits associated with securitization became increasingly large, lenders began to look to other types of loans with which to create their complex securities.  Portfolio lenders began to package, underwrite, and sell automobile loans, then credit card loans, and ultimately commercial, non-consumer loans.

10.      By the mid to late 1990s, securitization had become so profitable that few investment banks maintained exclusively traditional, portfolio-lending strategies.  Extraordinary profits in securitization were realized as interest rates, coupled with an influx of capital from abroad, helped fuel a boom in home ownership and a dramatic increase in home values. Between 1997 and 2006, the price of the typical American home reportedly increased by 124%.

11.     Securitization increasingly offered significantly higher returns than traditional, conservative investments such as U.S. Treasury Bonds.   The profits associated with securitization had become so immense that UBS -- once renowned for conservative investment banking -- declared the following "mission statement" in May 2005: "To be the **dominant global intermediary** in the residential mortgage and asset-backed market" (emphasis in the original).

12.     In June 2005, in furtherance of this mission, UBS began to vertically integrate the origination and securitization of loans and other debts, in accordance with a "moving not storage" model. That is, loans, and their associated risks, were originated but not retained for the long-term, according to a traditional model.  Instead, the loans, and their associated risks, were acquired for distribution through the securitization process.

13.     To accomplish this, UBS formed Dillon Read Capital Management ("Dillon Read"). According to its Shareholder Report on UBS' Write-Downs (April 18, 2008), Dillon Read maintained an asset-backed security ("ABS") trading desk where it "accumulated and repackaged" collateralized debt obligations ("CDOs"), which included CLOs.

14.     A CLO is a type of collateralized obligation backed primarily by commercial loan collateral, as opposed to consumer debt, including mortgage loans. Due to the heterogeneous nature of commercial loan collateral, and the lack of uniformity in terms, credit quality is considered difficult to quantify and control.

15.     UBS' Dillon Read acquired billions of dollars in collateral loans, including mortgages, commercial loans, and consumer loans. By May 2007, the value of its acquisitions was estimated to be $20 billion.

5

16.     However, the market for asset-backed securities began to deteriorate after its mid-2006 peak. This decline began to affect the financial markets early in 2007.

17.     UBS knew of the heightened risk associated with asset-backed securities. According to internal email correspondence, in January/February of 2007, UBS observed "dislocation" in the financial markets, and encouraged its sales staff to make "risk reducing trades," i.e. getting rid of asset-backed securities, its "top priority." Consequently, in January/February 2007, UBS began divesting itself of any interests in CDO/CLO and other asset-backed securities, while fraudulently inducing Plaintiffs and other investors to purchase those interests.

18.     Around May 2007, according to internal UBS email exchanges, UBS became aware that the rating agencies were changing their methodology in such a manner as to decrease the value of asset-backed securities, which undoubtedly caused UBS to accelerate the dumping of its interests in asset-backed securities.

19.     On July 10, 2007, Standard & Poor's announced methodology revisions which would affect $12.078 billion in rated residential mortgage-backed securities due to poor collateral performance.  This rating change also impacted the value of and market for commercial loans.

20.     According to UBS literature, the "music stopped" for the CDO/CLO market in August 2007. According to UBS, the music would return once the market shed $240 billion of loan commitments made prior to July 31, 2007, with their "[weak] covenants, highly leveraged borrowers, and tight coupon spreads."

21.     By this time, UBS knew that its asset-backed securities were materially and adversely impacted. According to internal email exchanges, UBS traders openly referred to their

own asset-backed securities in very unflattering terms. Selling these securities was referred to as moving "crap" and "dry gun powder."

22.    Thus, in early to mid 2007, when the financial markets became increasingly unsteady, and the "music stopped," UBS' mission became an exit strategy, and, in simple terms, a strategy of dumping instruments which were known by UBS, but not investors, to be of lesser quality than represented.

23.    Within this context, the Plaintiffs were misled into investing $40 million in the equity tranche of a CLO, masterminded and controlled by UBS, through aggressive and false representations regarding the "conservative" nature of the risk associated with the investment, as well as UBS' ability to assess and control risk.  Plaintiffs were also misled to believe that UBS would act so as to facilitate a closing of the CLO, and thereby protect their interest in the transaction.

24.    In keeping with its strategy of dumping interests in asset-backed securities, UBS created the Acadia CLO as a means to shed high-risk commercial loans from its balance sheets, and to milk funds from Plaintiffs as demonstrated, without limitation, by UBS' (1) refusal to close the transaction, (2) misrepresenting its commitment to purchase the senior tranche of securities issued by the Acadia CLO, (3) effort to intimidate the Plaintiffs into infusing more capital into the transaction to avoid liquidation, (4) retaliation against Plaintiffs, when Plaintiffs refused to infuse more capital into the CLO, and (5) liquidating the CLO collateral assets.  The transaction was ultimately a complete loss for the Plaintiffs, whereas UBS realized for itself the $40 million invested by Plaintiffs.

25.    UBS' actions relative to CDO/CLO transactions is consistent with poor risk management and a general "culture of corruption" within the firm. A tangible example of this

culture is demonstrated by its agreement, on February 18, 2009, to pay a fine of $780 million to the U.S. Government and to enter into a deferred prosecution agreement, in response to charges of conspiring to defraud the United States by impeding the Internal Revenues Service's investigation of its role in assisting tax evasion strategies by U.S. citizens.

## JURISDICTION AND VENUE

26.     This Court has personal jurisdiction over the Defendants pursuant to MCL §600.705.

27.     This action presents common law and statutory claims. The statutory claims arise under the the Michigan Public Employee Retirement System Investment Act, MCL §38.1132, et seq. Jurisdiction is therefore in furtherance of the public policy of the State of Michigan.

28.     The acts and omissions giving rise to Plaintiffs' tort claims against the Defendants, as well as the consequences of those acts and omissions, occurred in the County of Wayne and the State of Michigan.

29.     The amount in controversy exceeds $25,000.

30.     Jurisdiction and venue are properly laid in this Court.

## PLAINTIFFS

31.     Plaintiff General Retirement System for the City of Detroit ("GRS") is a pension plan and trust established by the Charter and Municipal Code of the City of Detroit, Michigan, with offices at 908 Coleman A. Young Municipal Center in Detroit, Michigan 48226. There are approximately 20,513 participants, who reside in many states, including, but not limited, to Michigan, New York, and Connecticut

32.     Plaintiff Police and Fire Retirement System for the City of Detroit ("PFRS Board") is a pension plan and trust established by the Charter and Municipal Code of the City of

Detroit, Michigan, with offices at 908 Coleman A. Young Municipal Center in Detroit, Michigan 48226.   There are approximately 12,553 participants, who reside in many states, including, but not limited, to Michigan, New York, and Connecticut

## DEFENDANTS

33.   UBS AG ("UBS") is an international financial services firm, specializing in wealth management, asset management, and investment banking, headquartered in Zurich and Basel, Switzerland, and conducting business in the United States and Wayne County through its various divisions and subsidiaries.

34.   UBS Securities, LLC ("UBSS"), formerly known as UBS Warburg, LLC, is a Delaware limited liability company, with its principal place of business located in New York City. UBSS is a broker-dealer and engages in a nationwide securities business, and at all relevant times conducted business within Wayne County.

35.   UBS Investment Bank ("UBSI") formerly known as UBS Warburg and Warburg Dillon Read, is the investment banking arm and business division of UBS AG, offering securities brokerage and investment banking services, with its principal place of business located in New York City, and at all relevant times, conducted business within Wayne County.  UBSI, UBSS, and UBS are hereafter collectively referred to as the "Defendants."

## COMMON ALLEGATIONS

36.   Plaintiffs incorporate herein by reference all above-stated paragraphs.

37.   In April 2006, the Defendants approached the PFRS, through Miller & Jacobs Capital, LLC ("Miller & Jacobs") with a proposal for an investment of pension funds in a CLO transaction known as the Acadia CLO I Fund ("Acadia CLO").   Specifically, the Defendants proposed an investment in equity securities, to be issued by the Acadia CLO, a special purpose

9

entity established by UBS to purchase and amass collateralized commercial loans, and to sell participations in the Acadia CLO to various customers of UBS and to UBS itself. The collateral portfolio of the Acadia CLO was to be managed by Miller & Jacobs.

38.     Subsequently, in October 2006, the Defendants made the identical proposal, through Miller & Jacobs, to the GRS. The materials presented to both Plaintiffs were prepared by or with the authorization of the Defendants and contained materially false representations regarding the transaction, including without limitation the risk and anticipated returns associated with the CLO.

39.     Among other false representations regarding risk, the Defendants falsely represented that (1) UBS possessed the expertise to assess and control risk levels, and would utilize that expertise relative to an investment in the Acadia CLO; and (2) the risks associated with an investment in the Acadia CLO were "conservative" in nature.

40.     The Defendants falsely represented that they would independently analyze, assess, and control risk, through their oversight role and final decision-making authority as set forth in the following "Investment Selection and Risk Management" procedure:

- "Through our relationships with Financial Institutions, Loan Arrangers and Private Equity Firms, we receive invitations to invest in senior secured, leveraged loans in the primary markets."

- "The Portfolio Manager reviews the transactions for credit quality and fit within the CLO based on industry, rating, loan spread, credit worthiness, and relative value."

- "If the Portfolio Manager determines that there is a fit for the investment within our portfolio, the transaction is assigned to a Credit Analyst based on industry expertise for a thorough credit review and analysis."

- "If the Credit Analyst recommends the investment, the analysis is reviewed by the Portfolio Management Team and a final decision is made as to the suitability of the investment."

10

41.   The Defendants further represented that the "CLO will utilize monitoring and compliance software from Wall Street Office or a similar vendor to ensure investment eligibility and compliance with CLO covenants" and that Defendants would monitor credit risks on a "daily basis regarding company news, earnings releases, stock prices, ratings changes, loan covenant compliance, 10-Qs, etc." Defendants represented that they would "maintain contact with company management" and issue "written reviews of credit risk on a quarterly basis or more often as required."

42.   With regard to the nature of the risk, the Defendants represented the degree of risk posed by an investment in the Acadia CLO was "conservative" (low) in nature. Specifically, the Defendants represented that the anticipated 10-15% returns were based on "conservative estimates of defaults and losses," and that they would "enhance total potential return while minimizing risk." Defendants also represented that "Acadia CLO will maintain a relatively conservative investment philosophy."

43.   These representations regarding UBS' ability to control risk, due diligence, and the nature of the risk, were material to the transaction, particularly in light of the unique nature of a CLO. A CLO is collateralized primarily with commercial loans with non-uniform loan terms, making payment verification and credit characteristics harder to monitor.

44.   In April 2006, the Defendants issued a Confidential Information Memorandum ("The Memorandum") to the Plaintiffs. In the Memorandum, the Defendants reiterated the high return/low risk nature of an investment in the Acadia CLO: 10-15% returns "after conservative estimates of defaults and losses."

45.   The Defendants represented that the returns of an investment in the Acadia CLO would be independent of economic downturns: "While performance in other asset classes has

11

been heavily dependent on proper timing, bank loans have produced solid, steady returns during each stage of the economic cycle." Moreover, according to the Defendants, the Acadia CLO utilized proactive risk assessment: "Proactive portfolio management focuses on credit analysis, market technicals, and relative value." The Defendants failed to disclose that due to their internal management decisions resulting from the downturn in the financial markets that they had no intention to purchase the senior tranche of AAA Acadia CLO securities and to close the Acadia CLO.

46.    The Defendants' representations regarding their ability to assess and control risk were untrue, and known to be untrue by the Defendants. For instance, in a UBS Report, the Defendants acknowledged that a "fragmented [credit risk] approval structure" at UBS resulted in credit risk approval decisions being made after the CDO/CLO assets had been acquired and sold to special purpose entities, such as the Acadia CLO. The Report further cited an "absence of risk management," "incomplete risk control methodologies," and "misincentives" that arose from the CDO/CLO origination and purchasing desks sharing the same reporting lines.

47.    The Defendants' representations regarding the "conservative" nature of the risk were also untrue, and known to be untrue by the Defendants.  Had Defendants believed these investments were truly conservative, they would have purchased the senior tranche of AAA Acadia CLO securities (which carried the least risk of the tranches) as promised; but UBS refused to place the risk associated with the purchase on its balance sheets.

48.    To further induce the Plaintiffs to fund the Acadia CLO, the Defendants touted the specialized expertise of the individuals who were to manage the collateral portfolio within Acadia CLO.  For example, Defendants stated that "Miller & Jacobs Capital is an institutional research firm managing multiple funds, with a specialization in financial services companies,

structured finance, and value-oriented investment strategies." Miller & Jacobs' five principal employees to be involved in the management of Acadia CLO had "over 50 years of combined experience in banking, financial services, and asset management." Miller & Jacobs employed "10 investment professionals in portfolio management, trading, and research with over 80 years of combined experience," in addition to "7 operational, technical, and client relations personnel with over 40 years of combined experience."

49.     Additionally, the Defendants brought a CLO expert to the transaction: Tammy Dalton. Ms. Dalton came from a firm "ranked as one of the top 5 CLO managers globally". Ms. Dalton was touted as a tried and tested CLO veteran:  "Ms. Dalton has over 11 years of experience in leveraged finance and distressed investments, and has managed assets in CLO portfolios since 1998."

50.     Defendants' rosy representations were inconsistent with what UBS secretly knew: that the credit markets, the ratings of loans and asset-backed securities, and the residential housing market were in a precarious state, and that a collapse in any one of these would materially and adversely impact the market for commercial loans and CLOs.  Armed with this knowledge, the Defendants were actively trying to rid their balance sheets of instruments and assets such as the CLO collateral.

51.     For instance, according to a UBS Report, "In September 2006, Group Senior Management expressed general concerns about the US housing market within the GRSC [Group Executive Board Risk Subcommittee]. Further, from the time the first losses in DRCM [Dillon Read] became apparent in Q1 2007, the GRSC was alert to the issues associated with Subprime investments generally and keen to understand UBS' exposure to these markets."

52.     In fact, in early 2007, the Defendants were dumping – rather than purchasing – asset-backed securities. According to internal email correspondence, UBS was aware in January/February 2007 of "dislocation" in the financial markets, and the need of its sales staff to make "risk reducing trades," i.e., to move asset-backed securities, its "top priority."

53.     The Defendants declined to disclose these material facts to Plaintiffs. As a result of Defendant's omissions of material fact, and in reliance on the misrepresentations elaborated above, including Defendants' promise to purchase at market rates the senior tranche of AAA securities (70% of the transaction size), the PFRS approved an investment of $20 million in the Acadia CLO on December 21, 2006, and the GRS approved an investment in the same amount on January 10, 2007.

54.     The Plaintiffs entered into a Letter Agreement with the Defendants, dated December 20, 2006, to fund the Acadia CLO with $40 million ($20 million from each Plaintiff) and to become Equity Investors in the CLO.

55.     Pursuant to the Letter Agreement, the Defendants agreed to finance the "ramp-up of Collateral," i.e., the purchase of the collateral, for the benefit of the Issuer (Acadia CLO), in exchange for a "100% participation interest" in each Collateral Obligation.  In other words, the Defendants agreed to acquire the collateral for the Acadia CLO in exchange for an interest in the collateral portfolio, which would continue until a closing, termination, or liquidation.

56.     Miller & Jacobs agreed to act as the Collateral Manager for the portfolio of "leveraged loans" warehoused in Acadia CLO (the special purpose entity), and to issue debt securities at the anticipated closing.  The par amount of the securities was expected to be $40 million, with classes of securities rated as "Aaa," "Aa2," "A2," "Baa2," and "Ba2," respectively,

14

by Moody's Investors Securities, Inc. and Standard and Poors Rating Services ("Rating Agencies").

57.    The promise of financing from UBS, coupled with the promise that the Plaintiffs would hold an equity interest in the purportedly high-return and low-risk investments, induced Plaintiffs to enter into a Risk Sharing Agreement with the Defendants.   The Agreement established an Escrow Account ("Escrow"), and identified the terms governing the Escrow. The Escrow held the $40 million deposit by the Plaintiffs, and was referred to as the "First Loss Deposit." The Escrow Agent was instructed to maintain the deposit in trust for the benefit of the Defendants until the Acadia CLO was liquidated, terminated, or closed. The Defendants were aware that the only way the Plaintiffs could earn a return on their investments would be if the transaction closed. Thus, if UBS failed or refused to close the transaction, and liquidated the collateral, Plaintiffs would lose their $40 million investment. Consequently, Defendants had tremendous leverage and control over the Plaintiffs' investment.

58.    The Plaintiffs only agreed to this "first loss" arrangement because of the Defendants' representations that the Acadia CLO equity tranche was an exceptionally safe and lucrative investment, and that Defendants would facilitate a closing by purchasing the senior tranche of the CLO.  Additionally, the Plaintiffs reasonably expected that the Defendants would execute their obligations and rights related to the Acadia CLO in good faith and in accordance with their duties to the Plaintiffs.

59.    On January 12, 2007, the Plaintiffs entered into a Warehouse Agreement with the Defendants, which set forth the terms and conditions for the purchase and disposition of the collateral portfolio, as well as a Master Participation Agreement, which more fully defined the Defendants' participation rights to the collateral portfolio within the CLO.

15

60.     Pursuant to the Warehouse Agreement the Defendants agreed to finance the acquisition of the collateral portfolio comprising the Acadia CLO. The Defendants retained ultimate and exclusive control over which loans were selected for the portfolio and which loans were rejected.

61.     Pursuant to the Warehouse Agreement and the Master Participation Agreement, the Defendants retained control over the Acadia CLO until liquidation or closing. This control is manifest throughout the Agreement including without limitation, the following terms: (1) the Defendants possessed the exclusive right to declare a "sales trigger event" and terminate its 100% participation interest in the Collateral Obligations, i.e., liquidate the portfolio, and (2) they appointed themselves attorneys-in-fact of Acadia CLO for the purpose of "taking any action and executing any instruments, in the name of or on behalf of the Issuer, which UBS may reasonably deem necessary or advisable to accomplish the purposes of this Agreement or the Participation Agreement..."

62.     Under the various Agreements, the Plaintiffs would benefit from their substantial investment in the Acadia CLO only if the Defendants facilitated a closing, at which time they would receive a spread between income earned on assets (the principal payments) and the interest paid on liabilities. Otherwise, if the Acadia CLO were liquidated by the Defendants, the Plaintiffs would lose their investment.

63.     In the Memorandum, the Defendants represented that the transaction would close within three to nine months, which was reasonable in light of the Defendants' promise to purchase, if necessary, the senior tranche of AAA securities (70% of the transaction size by this time).

64.     However, due to UBS' culture of corruption, and its inadequate risk management, the Defendants refused to purchase the senior tranche of securities. This ultimately prevented the transaction from closing. Because the Plaintiffs were in a first-loss position, UBS had an inherent disincentive to purchase the senior tranche of the securities -- the Defendants could simply shift the losses to the Plaintiffs.

65.     In fact, in early 2007, the Defendants were dumping –rather than purchasing – their asset-backed securities. To reiterate, in January/February of 2007, UBS was aware of "dislocation" in the financial markets, and urged its sales staff to make "risk reducing trades," i.e. to dump asset-backed securities, its "top priority."

66.     During the summer of 2007, having lost confidence in UBS' commitment to close the Acadia CLO, and if necessary, to purchase the AAA senior tranche securities, Plaintiffs negotiated with UBS and Miller & Jacobs to secure an alternative warehouse lender to replace UBS.

67.     On September 14, 2007, the Defendants notified the GRS and PFRS that they planned to liquidate the collateral portfolio at a complete loss to the pension funds. The Acadia CLO had already lost $15-16 million in value when the Defendants issued notice to the Plaintiffs that a trigger event had occurred and that UBS "hereafter intends to pursue any and all remedies available to it...including without limitation, directing the sale of the Collateral Obligations constituting the Warehouse Portfolio, terminating UBS' participation interests in all of the Collateral Obligations, and securing full payment to UBS of all amounts owing to it."

68.     In an effort to distract and shift blame, the Defendants agreed to forego a liquidation of the Acadia CLO provided that a new collateral manager was brought into the transaction. The parties agreed to substitute Avenue Capital Management ("Avenue Capital") for

17

Miller & Jacobs as the Collateral Manager of the Acadia CLO. However, Miller & Jacobs continued its involvement with the Acadia CLO as an "Equity Advisor." As a consequence, the Warehouse Agreement was amended on September 13, 2007, and on November 16, 2007, a new Letter Agreement (on UBS letterhead) was entered into by the GRS and PFRS, the Defendants, and Avenue Capital.

69.    In an effort to salvage the transaction, Avenue Capital attempted to move the CLO warehouse to another structure held by Morgan Stanley Bank.

70.    On November 16, 2007, to induce Plaintiffs not to transfer the warehouse to Morgan Stanley, the Defendants represented to the parties that they had the ability to close the CLO, would close the CLO, and assured the parties that if the Defendants were unable to sell the Senior AAA Tranche by closing, that they would purchase such tranches themselves. However, Defendants knew at that time that they did not intend to purchase the Senior AAA Tranches, or to close the CLO, due to among other things UBS's policy to divest itself from further risk associated with collateralized obligations.

71.    That Defendants had no intention of closing the Acadia CLO, and purchasing the senior tranche of securities, if necessary, is also demonstrated by their continued refusal to perform these actions, as well as their refusal to actively market the sale of the Acadia CLO securities – in the United States, Asia, and Europe – as represented, and by their dumping securities in other collateralized debt obligations to other customers of UBS. As further evidence of its intent not to close the CLO or to buy the Senior AAA Tranches, UBS refused to participate in a marketing tour for the purpose of marketing and selling securities in the CLO, even though UBS previously agreed to participate in the marketing tour.

72.     To further demonstrate Defendants' fraudulent intent, they refused to close the transaction even when, in January 2008, Avenue Capital and Miller & Jacobs offered to reduce their Warehouse Management Fees in order to induce the Defendants to close the CLO.

73.     Despite the offer by Avenue and M&J to reduce their Warehouse Management Fees, the Defendants steadfastly refused to close the transaction, because they were unwilling to accept the risk associated with a purchase of the senior tranche of securities and they knew they would have full recourse to the Plaintiffs' $40 million for balance sheet repair.

74.     On January 14, 2008, the Defendants issued notice to the Plaintiffs that a Sale Trigger Event had occurred, and that they intended to "exercise [their] right to compel the sale of the Collateral Obligations constituting the Warehouse Portfolio in one or more private sales after Monday, January 14, 2008."

75.     The Defendants' notice of a trigger event was merely a pretext to avoid its commitment to purchase the senior AAA tranche, and to seize the Plaintiffs' $40 million investment to repair their own damaged balance sheets.

76.     In January 2008, the Defendants again attempted to pressure the Plaintiffs into infusing $10 million more into the equity tranche of the CLO, rather than purchasing the senior AAA tranche of securities, if necessary, and closing the transaction as they agreed to do.

77.     On February 6, 2008 (at 1:51 p.m.), the Defendants advised the Plaintiffs that they needed "to hear some feedback from you on the progress in purchasing the loans in this deal. We are at the point where we are seriously considering the liquidation of this portfolio." In other words, Defendants were pressuring the Plaintiffs to infuse more capital into the CLO or lose everything, even though Defendants refused to abide by their commitment to close the

transaction, and to purchase the senior tranche of Acadia CLO securities, if necessary to achieve this.

78.     The very next day, on February 7, 2008, the Defendants, without basis, notified Avenue Capital and Miller & Jacobs that they were terminating their written commitment to purchase the senior tranche "without cause and based on the market conditions…," which effectively rendered a closing impossible.

79.     On February 8, 2010, the Defendants liquidated the remaining collateral in the Acadia CLO, although on information and belief, they had already begun secretly liquidating the portfolio well in advance, without notice to the parties, and while falsely representing to the parties that it was endeavoring to close the transaction and purchase the senior AAA tranche.

80.     The liquidation of the fund amounted to a complete loss to the Plaintiffs.

81.     The Plaintiffs lost their $40 million investment as a direct result of the Defendants' (1) aggressively fraudulent representations regarding the nature of the risk associated with an investment in the Acadia CLO, the ability of UBS to assess and control risk levels, and the anticipated returns associated with such an investment; and (2) the Defendants' use of the CLO as an instrument to defraud, as evidenced by the aforementioned misrepresentations which were an inducement to contract, the fact that UBS used the Acadia CLO to dump its own high-risk loans, UBS' refusal to purchase the senior tranche of AAA securities despite its contractual commitment to do so, UBS' refusal to close the transaction in order to circumvent its obligation to purchase the AAA senior tranche, UBS' bad faith declaration of a second Sales Trigger Event coupled with demands for additional capital from the Plaintiffs, and the secret liquidation of Acadia CLO loans by UBS without notice to the parties, while falsely representing that it was endeavoring to  complete the transaction.  In essence, the

20

Defendants used the Acadia CLO as an instrument to dump high-risk securities from their own balance sheet, and to appropriate $40 million or more from the Plaintiffs to use for their own purposes to repair their balance sheets.

## Count I- Violation of Duty of Care and Duty of Loyalty Based on Mich. Comp. Laws §38.1133

82.   Plaintiffs incorporate by reference the allegations contained in paragraphs 26 through 81 as if fully set forth herein.

83.   At all relevant times, Defendants acted as a fiduciary within the meaning of Mich. Comp. Laws §38.1132c subsection 12c(1) and §38.1133 subsection 13(3) by exercising discretionary authority or control with respect to the investment.

84.   Pursuant to Mich. Comp. Laws §38.1133 subsection 13(3), the Defendants owed Plaintiffs a duty of care in their capacity as manager's and trustees of Plaintiffs' investments in the Acadia CLO.

85.   This duty included the obligation to act with the same care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims. Therefore, the Defendants were required to exercise reasonable care and prudence in the handling of investments made by the Acadia CLO and in the management of its closing.

86.   The Defendants had a duty of loyalty to manage the creation and issuance of the Acadia CLO solely in the interests of the Plaintiffs and the plan participants whose assets they manage and for the exclusive purpose of providing benefits to participants and participants' beneficiaries and defraying reasonable expenses of investing the Plaintiffs' assets.

87. The Defendants' actions were designed to and had the effect of increasing revenue to the Defendants without regard for the losses suffered by the Plaintiffs.

88.     The Defendants created a conflict of interest whereby Defendants disloyally placed their interests above the interests of the Plaintiffs and used the Plaintiffs' losses for the Defendants' own benefit. Specifically, Defendants utilized the Acadia CLO to rid high-risk commercial loans from their balance sheets, and orchestrated the transaction such that a failure to close was a gain to Defendants, but a loss to Plaintiffs.

89.     Defendants earned substantial fees and profits as a result of acting in their own self interest.

90.     By employing their "heads I win, tails you lose" first-loss collateral assembly strategy and then by liquidating the Acadia CLO for their own benefit and in bad faith, Defendants violated their duty of loyalty under Mich. Comp. Laws §38.1133 subsection 13(3).

91.     The Defendants also acted in bad faith by liquidating the collateral in order to avoid a closing on the Acadia CLO, and thus circumventing their obligation to purchase the senior AAA tranche of securities on or before the closing in the event that they had not placed the senior tranche with other investors.

WHEREFORE, Plaintiffs request the relief set forth below.

## Count II – Intentional Fraud

92.     Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

93.     The Defendants made false or otherwise misleading representations to Plaintiffs regarding their ability and willingness to close the Acadia CLO and bring it to market, and the projected performance of Plaintiffs' investment in the CLO, including but not limited to false or misleading projections of default rates and return on their investment. The Defendants knew that

22

these representations were false when they were made, because they knew that the market for commercial loans was deteriorating.

94.    The Defendants made these misrepresentations to Plaintiffs in order to induce them to invest in the Acadia CLO generally, and to agree the $40 million first loss position specifically.

95.    Neither of the Plaintiffs would have placed their respective $20 million into escrow as a first-loss deposit on the Acadia CLO or otherwise invested in the Acadia CLO but for these misrepresentations.

96.    As a result of the Defendants' fraudulent conduct, Plaintiffs have suffered considerable financial loss.

WHEREFORE, Plaintiffs request the relief set forth below.

## Count III – Innocent/Negligent Misrepresentation

97.    Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

98.    The Defendants made false or otherwise misleading representations to Plaintiffs regarding their ability and willingness to close the Acadia CLO and to bring it to market, and of the projected performance of Plaintiffs' investment in the CLO, including but not limited to false or misleading projections of default rates and return on their investment. The Defendants should have known in the exercise of due care that these representations were false when they were made.

99.    The Defendants made these misrepresentations to Plaintiffs in order to induce them to invest in the Acadia CLO generally, and to agree to the $40 million first loss position specifically.

23

100.   Neither of the Plaintiffs would have placed their respective $20 million into escrow as a first-loss deposit on the Acadia CLO or otherwise invested in the Acadia CLO but for these misrepresentations.

101.   As a result of the Defendants' conduct, Plaintiffs have suffered considerable financial loss.

WHEREFORE, Plaintiffs request the relief set forth below.

### Count IV – Silent Fraud

102.   Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

103.   The Defendants made representations regarding the safety of investing in the Acadia CLO and the expected return on such an investment; having done so, they had a duty to tell Plaintiffs that they had determined that the commercial loan market was deteriorating and that UBS itself was attempting to disinvest in the market.

104.   Defendants failed to disclose to Plaintiffs that a substantial number of their own high-risk commercial loans were going to be dumped into the Acadia CLO portfolio, and that Plaintiffs' loss resulting from a failure to close the CLO would be Defendants' gain.

105.   The Defendants never disclosed these facts to the Plaintiffs, even though it knew these facts at the time that it made its representations regarding the Acadia CLO.  Had they disclosed these facts, neither of the Plaintiffs would have placed their respective $20 million into the first-loss escrow, or would have otherwise invested in the Acadia CLO.

106.  The Defendants intended that their silence on these issues would induce Plaintiffs to place their respective $20 million into the first-loss escrow and to otherwise invest in the Acadia CLO.

24

107.   As a result of the Defendants' silent fraud, Plaintiffs have suffered considerable financial loss.

WHEREFORE, Plaintiffs request the relief set forth below.

### Count V – Breach of Contract

108.   Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

109.   The Defendants entered into a valid and binding agreement with Avenue Capital and Miller & Jacobs to purchase the senior tranches of the Acadia CLO, which was intended to benefit Plaintiffs and to enable a closing of the CLO.

110.   The Defendants also entered into a valid and binding agreement to "use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner."

111.   The Defendants breached these obligations by refusing to perform them as promised.

112.   Defendant also breached the parties' contract by breaching the implied duty of good faith and fair dealing.

113.   As a result of the Defendants' breaches of the agreement, Plaintiffs have suffered considerable financial loss.

WHEREFORE, Plaintiffs request the relief set forth below.

### Count VI – Breach of Fiduciary Duty

114.   Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

115.   The Defendants owed a fiduciary duty to each of the Plaintiffs, because of their obligations under MPERSIA and common law.

25

116.   The fiduciary relationship arose, in part, because Defendants had discretionary control over Plaintiffs' investments because they were engaged in a joint enterprise with Plaintiffs.

117.   The Defendants' fiduciary duty included the obligation to act with the same care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims. Therefore, Defendants were required to exercise reasonable care and prudence in the handling of investments made by the CLO and in their management of the CLO's closing.

118.   Defendant thus had a duty of loyalty to manage the creation and issuance of the Acadia CLO solely in the interests of the Plaintiffs and the plan participants whose assets they manage and for the exclusive purpose of providing benefits to participants and participants' beneficiaries and defraying reasonable expenses of investing the Plaintiffs' assets.

119.   Instead, Defendants' actions were designed to and had the effect of increasing revenue to the Defendants without regard for the losses suffered by the Plaintiffs.

120.   Defendants created a conflict of interest whereby Defendants disloyally placed their interests above the interests of the Plaintiffs and used the Plaintiffs' losses for the Defendants' own benefit. Specifically, Defendants utilized the Acadia CLO to rid high-risk commercial loans from their balance sheets and orchestrated the transaction such that a failure to close was a gain to Defendants, but a loss to Plaintiffs.

121.   Defendants earned substantial fees and profits as a result of acting in their own self interest.

122.   By employing their "heads I win, tails you lose" first-loss collateral assembly strategy, for their own benefit, which was highly risky to the Plaintiffs, the Defendants violated their duty of loyalty.

123.   As a result of the Defendants' breach of fiduciary duty, Plaintiffs have suffered considerable financial loss.

WHEREFORE, Plaintiffs request the relief set forth below.

### Count VII – Unjust Enrichment

124.   Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

125.   The Defendants induced Plaintiffs to each make $20 million first-loss escrow deposits for the Acadia CLO and to otherwise invest in the CLO.

126.   The Defendants took advantage of these deposits by liquidating the Acadia CLO in bad faith, and using the Plaintiffs' deposits to cover their losses.

127.   In fact, the Defendants knew from the time of the Plaintiffs' investments that the commercial loan market was deteriorating.  Their arrangement with Plaintiffs was designed as a "heads we win, tails you lose" venture, with Plaintiffs unwittingly protecting the Defendants from the risks of which they were aware and which they hid from Plaintiffs.

128.   As a result of Defendants' unjust enrichment, Plaintiffs have suffered considerable financial loss.  It would be inequitable to permit the Defendants to retain this benefit.

WHEREFORE, Plaintiffs request the relief set forth below.

## Count VIII – Accounting

129.    Plaintiffs incorporate by reference each allegation set forth above as if restated fully herein.

130.    Under their common enterprise with the Defendants, Plaintiffs each provided a $20 million first-loss deposit into escrow, resulting in revenue to the Defendants.

131.    The Defendants represented to Plaintiffs that this common enterprise would result in profits, although it has only resulted in losses for Plaintiffs.

132.    Plaintiffs have demanded an explanation of how the Defendants utilized their funds, but the Defendants have refused.

WHEREFORE, Plaintiffs request the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and permanent relief against Defendants as follows:

(a)     rescinding the Acadia CLO transaction;

(b)     in the alternative, for damages in an amount to be determined at trial, together with pre-complaint interest at the maximum rate allowable by law and prejudgment interest;

(c)     awarding exemplary or punitive damages, together with their reasonable costs and expenses incurred in this action

(d)     awarding Plaintiffs their costs and attorneys fees incurred, and all other such relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, General Retirement System for the City of Detroit, and Police and Fire Retirement System for the City of Detroit, hereby demand a jury trial on all issues so triable.

Respectfully Submitted,

**THE MILLER LAW FIRM, P.C.**

E. Powell Miller (P39487)
Marc L. Newman (P51393)
David H. Fink (P28235)
Christopher D. Kaye (P61918)
950 W. University Drive, Suite 300
Rochester, Michigan 48307
Tel:  (248) 841-2200
Fax: (248) 652-2852

**FLOYD E. ALLEN & ASSOCIATES, P.C.**
Kevin J. Campbell (P-66367)
2500 Fisher Building
3011 W Grand Boulevard
Detroit, Michigan 48202
Tel:  (313) 871-5500
Fax:  (313) 871-0517

Dated: September 2, 2010