UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, and
POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,

                Plaintiffs,

                                          Case No. 10-CV-13920

vs.                                   HON. GEORGE CARAM STEEH

UBS, AG, UBS SECURITIES, LLC,
and UBS INVESTMENT BANK

                Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [DOC. 17] AND ORDERING AMENDMENT OF THE COMPLAINT

Plaintiffs are the General Retirement System of the City of Detroit ("GRS") and the Police and Fire Retirement System of the City of Detroit ("PFRS") (collectively, the "Systems"). The Systems are pension plans established by the Charter and Municipal Code of the City of Detroit. The Systems filed this action against UBS Securities, LLC, UBS AG, and UBS Investment Bank, alleging that the UBS defendants fraudulently induced the Systems into buying an equity position in a collateralized loan obligation ("CLO"), and for breaches of their fiduciary duty for improperly liquidating the securities solely for their own benefit, thereby depriving the Systems of their investment.

On September 2, 2010, plaintiffs filed this lawsuit in the Wayne County Circuit Court (Case No. 10-010216-CK), seeking to recover their $40 million investment. The complaint sets forth various common law claims, including breach of contract (Count V), unjust enrichment (Count VII), fraud (Count II), silent fraud (Count IV), innocent/negligent misrepresentation (Count III), breach of fiduciary duty (Count VI), and the right to an

accounting (Count VIII), as well as violation of Michigan's Public Employee Retirement System Investment Act, MCL §38.1132, *et seq.* (Count I).  On October 1, 2010, defendants filed a notice of removal, asserting diversity jurisdiction under 28 USC § 1332(a)(1).  The court denied plaintiffs' motion to remand by order dated December 20, 2010.  (Doc. 24).  Defendants now bring a motion to dismiss all eight claims in their entirety.  Oral argument on defendants' motion was heard on March 31, 2011.

FACTS

A collateralized loan obligation ("CLO") is an investment backed by commercial loan collateral.  Basically, a CLO is an instrument by which an investor can invest in several commercial loans at once - for the price of the investment, the CLO holder is entitled to a proportionate share of the payments from each of the bundled loans.  The CLO holder may thus realize the benefits of holding commercial notes without the direct risk that any given borrower will default.

Some background on how a CLO is created is necessary to put the allegations into context.  A dealer, here UBS Securities, creates a special purpose vehicle referred to as the "Issuer", in this case Acadia CLO.  The Issuer purchases collateralized commercial loans.  Another firm, initially in this case Miller & Jacobs Capital ("M&J"), is retained to manage the Issuer's loan portfolio.  The dealer then structures the loan portfolio into "tranches" with different degrees of risk and return in order to sell securities from each tranche.  Purchasers of the securities acquire the right to capture the cash flow of interest and principal payments produced by the commercial loan assets held by the Issuer.  An investor's share of the cash flow depends on the degree of risk and return associated with the tranche that the investor elects to purchase, ranging from senior tranche (AAA) at the top of the tranche structure, to an equity tranche (unrated) at the bottom of the structure.  The lower tranches are the riskiest, as they are the first to absorb losses generated from

2

the underlying collateral portfolio, though they offer a higher potential return.

Plaintiffs allege that in April 2006, defendants approached the PFRS, through M&J, with a proposal for an investment in the Acadia CLO.  (Comp. ¶ 37)  An identical proposal was made to the GRS in October 2006.  (Comp. ¶ 38).  The investment proposed was in the equity tranche, the riskiest one, but plaintiffs allege that defendants represented expected returns of 10-15% based on conservative estimates of defaults and losses.  (Comp. ¶¶ 42, 44).  Plaintiffs contend that defendants knew these representations were untrue when they made them, as evidenced by contemporaneous internal documents expressing concerns about the riskiness of the CLOs and the weakness of the credit market.  (Comp. ¶¶ 46, 51, 20, 21, 50).

On December 20, 2006, plaintiffs entered into a Letter Agreement with defendants, in which defendant UBS Securities agreed to lend money to the Acadia CLO so that it could acquire commercial loans and issue collateralized securities in which plaintiffs would then invest.  (Comp. ¶¶ 54, 55).  In furtherance of the agreement, UBS AG entered into a Warehouse Agreement with M&J and the Acadia CLO, and into a Master Participation Agreement with the Acadia CLO, both dated January 12, 2007.  (Comp. ¶ 59).  Plaintiffs agreed to fund the Acadia CLO with $40 million ($20 million from each plaintiff) and to become Equity Investors in the CLO.  (Comp. ¶ 54).  They did so by placing $20 million each into an escrow account pursuant to a Risk Sharing Agreement, thereby assuming a pro-rata share of the first loss risk position on the Acadia CLO collateral.  (Comp. ¶ 57).  In the Escrow Agreement, the Escrow Agent was instructed to maintain the deposit in trust for the benefit of the defendants until the Acadia CLO was liquidated, terminated, or closed.  (Comp. ¶ 57).  In other words, UBS Securities agreed to finance the purchase of the commercial loans in the Acadia CLO, anticipated to cost $480 million, and plaintiffs agreed to cover up to $40 million of UBS Securities' losses in the event the commercial loans lost

value prior to liquidation or closing.

After the parties entered these agreements, the market for asset-backed securities deteriorated, impairing the value of the Acadia collateral.  By September 14, 2007, the Acadia CLO had already lost $15-16 million in value.   Pursuant to the Warehouse Agreement, defendants issued notice to the plaintiffs that a Sale Trigger Event had occurred and that defendants intended to liquidate the Acadia portfolio.  (Comp. ¶ 67). Pursuant to the Warehouse Agreement and Master Participation Agreement, defendants had the exclusive right to declare a Sale Trigger Event and terminate their 100% participation interest in the collateral obligations, i.e., liquidate the portfolio.  (Comp. ¶ 67).

Defendants did not immediately liquidate the collateral portfolio.  Instead, a new collateral manager, Avenue Capital Management II, L.P. ("Avenue Capital") was brought into the Acadia transaction.  Plaintiffs contend that they sought to transfer the collateral to a different entity and thus replace UBS.  (Comp. ¶ 66).  To induce the plaintiffs not to transfer the investment to another company, defendants represented that they had the ability to close the CLO, and assured the plaintiffs that if they were unable to sell the AAA tranche, they would purchase the tranche themselves.  (Comp. ¶ 70).  The parties amended various agreements governing the transaction.   (Comp. ¶ 68).   Plaintiffs continued to assume a pro-rata share of the first loss risk position (up to $20 million each) and defendants continued to provide financing for the acquisition of loan collateral.  (Letter Agreements dated November 16, 2007).

The global economy worsened and the Acadia portfolio continued to suffer losses. In January 2008, defendants attempted to pressure plaintiffs into infusing an additional $10 million into the equity tranche of the CLO.  (Comp. ¶ 76).  Plaintiffs refused, and defendants announced they were terminating their written commitment to purchase the senior AAA tranche without cause.  (Comp. 78).  On January 14, 2008, the defendants issued notice

to plaintiffs that a Sale Trigger Event had again occurred. (Comp. ¶ 74). The Acadia collateral was liquidated on February 8, 2008. (Comp. ¶ 79). The first $40 million of the portfolio's losses was absorbed by the funds plaintiffs had placed in escrow. (Comp. ¶¶ 57, 80). Plaintiffs seek to recover their "first loss" deposits in this lawsuit.

## LEGAL STANDARD

Rule 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. Under the Supreme Court's articulation of the Rule 12(b)(6) standard in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 554-56 (2007), the Court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. "[N]aked assertions devoid of further factual enhancement" are insufficient to "state a claim to relief that is plausible on its face". Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). To survive a Rule 12(b)(6) motion for dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Bell Atlantic, 550 U.S. at 555) (citations and quotations omitted). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Id. (citing Bell Atlantic, 550 U.S. at 555).

## ANALYSIS

### I. New York or Michigan Law

All of the contracts referenced in the Complaint contain choice-of-law provisions specifying New York law:

This Agreement shall be construed in accordance with, and this Agreement

and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York, without regard to the conflict of laws provisions thereof.

(Defendants' Motion to Dismiss, Ex. B, C, G, H at § 9(a)).

Federal courts sitting in diversity apply the choice-of-law rules of the forum state. Equitable Life Assur. Soc. of United States v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998). In Michigan, choice-of-law provisions are enforced unless either (i) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (ii) application of the chosen law "would be contrary to a fundamental policy" of the state whose law would otherwise apply.  Restatement (Second) of Conflict of Laws § 187(2)(a) (1971).

Plaintiffs argue that neither party has a substantial relationship to New York. Defendants are global entities without any particular connection to New York.  UBS Securities is a Delaware LLC, headquartered in Stamford, Connecticut and UBS AG is headquartered in Zurich and Basel Switzerland.  Acadia CLO is a Cayman Islands company.  The representations giving rise to the investment occurred in Detroit.

While New York may not have a substantial relationship to the parties, New York does have a highly developed body of commercial law, so it is reasonable in cases of complex financial transactions for parties domiciled in different states to elect New York law to govern their disputes.  There is a reasonable basis for the parties' choice of New York law in this case.

Plaintiffs next argue that Michigan has a substantial public policy interest in the application of Michigan statutory law. The Michigan Public Employee Retirement System Investment Act ("MPERSIA") MCL 38.1132 *et seq.* reflects the public policy of Michigan that fiduciary duties be imposed upon persons who control assets of public pension funds.

6

Plaintiffs contend that MPERSIA governs defendants as an "Investment Fiduciary" - an entity "who does any of the following: (a) Exercises any discretionary authority or control in the investment of a system's assets [or,] (b) Renders investment advice for a system for a fee or other direct or indirect compensation."  MCL 38.1132c(1).  Plaintiffs allege that defendants had both discretionary control over the investments, selecting which assets to acquire with the plaintiffs' $40 million investment, and that they provided investment advice.

The fiduciary duties under MPERSIA are analogous to those under ERISA, and include the duty to: (i) discharge duties solely in the interest of the participants and the beneficiaries; (ii) act with care, skill, prudence and diligence; (iii) act with due regard for the management, reputation, and stability of the issuer and the character of the particular investments being considered; and (iv) give appropriate consideration to the role the investment course of action plays in that portion of the system's investments for which the investment fiduciary has responsibility.  MCL 38.1133(3).

Plaintiffs point out that New York employs a different approach based on proportionate limits on the amount of money that a retirement fund may invest in a given type of security.   MPERSIA does not place limits on amounts that may be invested.  Plaintiffs contend that applying New York law in this case would be contrary to the public policy of Michigan, and therefore, Michigan law should apply to this dispute.

The court disagrees with plaintiffs.  First, MPERSIA does not provide a private right of action, so any conflict with New York statute is immaterial.  Second, MPERSIA defines "investment fiduciary" as an individual who exercises "discretionary authority or control in the investment of a system's assets" or "[r]enders investment advice for a system for a fee or other direct or indirect compensation."  MCL 38.1132c(1).  According to the terms of the Letter Agreements, the decision to invest in the CLO was made by plaintiffs alone, based on their independent assessment of the opportunity.  Plaintiffs' $40 million investment was

held by a third party escrow agent who could use the funds only for the specific purposes agreed to by plaintiffs.  The money was held in escrow "for the benefit of the defendants until the Acadia CLO was liquidated, terminated, or closed," and is not alleged to have been used by defendants to purchase any collateral.  UBS AG provided financing to purchase collateral for the Acadia CLO (totaling $400 million).  Defendants never exercised any discretion over the system's funds.  Similarly, defendants did not provide "investment advice for a system for a fee or other direct or indirect compensation."  MCL 38.1132c(1)(b).

There is no strong reason to upset the choice of New York law in the agreements entered into freely by the parties.  In addition, Count I and Count VI are dismissed for failure to state a claim, as explained below.

Count I of the complaint alleges breach of the duty of care and duty of loyalty under MCL § 38.1133.  This claim is dismissed because, even if Michigan law applied, and even if MPERSIA provided a private right of action, defendants do not fit the definition of "investment fiduciary" under the statute.  Count VI alleges breach of fiduciary duty under MPERSIA or common law.  This claim is dismissed because plaintiffs expressly acknowledge that defendants are not their fiduciaries.  Such acknowledgment appears in the Letter Agreements with UBS Securities, as well as in the Omnibus Amendment No. 1, between plaintiffs and UBS AG, that amended the January 2007 Risk Sharing Agreement.

II. Breach of Contract

Plaintiffs allege that the defendants breached their contractual promises in three separate ways: through (1) their failure to "use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner" as stipulated in § 2 of the Letter Agreements, 1 (Ex. G § 2, H § 2); (2) their failure to purchase the most senior tranche of securities and otherwise close the transaction as they promised to do in the November 16,

2007 Engagement Agreement; and (3) their breach of the implied duty of good faith and fair dealing. (Comp. ¶¶ 109-110, 111).

      A.    <u>UBS AG is Not a Party to Any of the Contracts</u>

Plaintiffs have included UBS AG as a defendant in their breach of contract claim. However, UBS AG is not a party to either the Letter Agreements or the Engagement Agreement. To state a contractual claim, the plaintiffs must have privity with the defendant. <u>Outrigger Const. Co., Inc. v. Bank Leumi Trust Co.</u>, 658 N.Y.S.2d 394, 396 (App. Div. 1997) ("The written construction contract was solely between the plaintiff and [a third party], and the plaintiff may not assert a contractual cause of action against a party with whom it was not in privity."). Lacking such privity, plaintiffs' breach of contract claims against UBS AG are dismissed.

      B.    <u>"Use All Reasonable Commercial Efforts"</u>

The Letter Agreements, entered into between the plaintiffs, Avenue Capital Management, Miller & Jacobs Capital, and UBS Securities, provide that "the parties [] shall use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner." (Ex. B, G & H § 2). Plaintiffs allege that defendants' failure to "use all reasonable commercial efforts" resulted in the Acadia CLO transaction not being completed, causing the plaintiffs great financial harm. (Comp. ¶¶ 110-11). In response defendants move to dismiss this claim, arguing that plaintiffs have failed to (1) identify which "reasonable commercial efforts" defendants neglected to take, or (2) show a causal nexus between the failure to adopt these efforts and the harm allegedly caused.

In <u>Ashcroft v. Iqbal</u>, the Supreme Court asserted that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 129 S. Ct. at 1949 (internal quotation marks omitted) (quoting <u>Bell Atlantic</u>, 550 U.S. at 557, 570). The Court further proposed a two-

pronged approach for the application of this standard, consisting of (1) an identification of mere "legal conclusions," which are "not entitled to the assumption of truth," and (2) assuming the truth of the remaining factual allegations, a determination of whether they state a plausible claim to relief. Id. at 1950 (citing Bell Atlantic, 550 U.S. at 555, 565-66); Whitney v. City of Milan, 720 F. Supp. 2d 958, 961-62 (W.D. Tenn. 2010).

Despite defendants' assertions that the plaintiffs have provided only mere legal conclusions, when the complaint is looked at as a whole, there are sufficient factual allegations to state a plausible claim to relief with respect to the defendants' alleged failure to adopt "all reasonable commercial efforts." See Yeiser v. GMAC Mortg. Corp., 535 F. Supp. 2d 413, 420 (S.D.N.Y. 2008) ("[I]n assessing the legal sufficiency of a claim, the court may consider the facts alleged in the complaint, any document attached as an exhibit or incorporated by reference and matters of which judicial notice may be taken."). Specifically, plaintiffs allege that defendants' breach of the Letter Agreements is the result of "their refusal to actively market the sale of the Acadia CLO securities," (Comp. ¶ 71), their refusal to complete the transaction after Avenue Capital and Miller & Jacobs sought to induce them to close, (Comp. ¶ 73), and their ultimate refusal to close the transaction. (Comp. ¶ 24).

Defendants next argue that plaintiffs' have failed to "state a claim to relief that is plausible on its face," see Iqbal, 129 S. Ct. at 1949, because they have not shown that any marketing efforts were required. The essence of the parties' disagreement therefore, is whether the promise to "use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner" included the obligation to market the Acadia CLO. In support of their argument, defendants both point out that marketing of the Acadia CLO is not mentioned in the Letter Agreements and that the lack of marketing by the parties indicates that it was never the intention of the parties to require such efforts. In response,

plaintiffs eschew an attempt to define "reasonable commercial efforts," and instead argue that they have no obligation to prove such an interpretation at this stage as such a determination is a factual matter inappropriate for resolution in a motion to dismiss.

Under New York law, "judgment as a matter of law is appropriate if the contract language is unambiguous." Photopaint Technologies, LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003). Whether a contract is ambiguous or not "is a question of law to be resolved by the courts." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004). "A contract is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Advanced Marketing Grp., Inc. v. Bus. Payment Sys., LLC, 300 Fed. Appx. 48 (2d Cir. 2008) (internal quotation marks omitted) (quoting Photopaint Techsnologies, 335 F.3d at 160). In examining this term, it is the "fundamental [] precept of contract interpretation [] that agreements [be] construed in accord with the parties intent." Greenfiel v. Phillies Records, Inc., 98 N.Y.2d 562, 569 (2002).

The best evidence of the parties' intent usually comes from the language of the contract itself. See id. Unfortunately, the agreements in this case offer little help in defining "reasonable commercial efforts." While the term appears in § 2 of the Letter Agreements, it is left undefined by the remaining portions of the contract and its meaning is not apparent from the context under which these agreements were entered into. Further, New York case law is similarly unhelpful in defining this term. See CSI Inv. Partners II, LP v. Cendant Corp., 507 F. Supp. 2d 384, n.27 (S.D.N.Y. 2007) ("Very few New York courts have addressed contracts which use the term 'reasonable commercial efforts' . . . '[r]easonable commercial efforts', therefore, is not a term which in New York has been defined as a matter of law.").

In support of their argument that resolution at this stage would be inappropriate, plaintiffs cite several cases, both from New York and Michigan, which they interpret to say that the term "all reasonable commercial efforts" is inherently ambiguous.  See CSI Inv. Partners II, 507 F. Supp. 2d at 403-04; 1000 N. of New York Co. v. Great Neck Med. Associates, 775 N.Y.S.2d 884 (N.Y. App. Div. 2004); Waun v. Univ. Coin Laundry Machine, LLC, 2006 WL 2742007 (Mich. Ct. App. Sept. 26, 2006).  Defendants however, seek to distinguish these cases, pointing to the fact that all three where decided prior to the Supreme Court's articulation of the standard for a 12(b)(6) motion to dismiss in Iqbal, see 129 S. Ct. at 1949, and arguing that they are factually dissimilar to the case at hand.  While the court is not convinced that the phrase "reasonable commercial efforts" is *inherently* ambiguous as plaintiffs argue, it is satisfied that the parties' disagreement as to its meaning is reasonable.  While defendants are correct in pointing out that there is no obligation to market the CLO expressly agreed to in any of the contracts, given the nature of the transaction, it is reasonable to conclude that the parties' intended "reasonable commercial efforts" to include some marketing of the CLO.  It would therefore be inappropriate to dismiss the plaintiffs' claim for breach of contract on these grounds.  See U.S. Naval Inst. v. Charger Commc'n, Inc., 875 F.2d 1044, 1048 (2d Cir. 1989) ("The meaning of a contract term that is susceptible to at least two reasonable interpretations is generally an issue of fact, requiring the trier of fact to determine the parties' intent."); Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 195 (E.D.N.Y. 2007) ("[W]here the contractual language is subject to more than one reasonable interpretation . . . the question of the proper interpretation is factual.").

"[U]nder New York law an action for breach of contract requires that the party prove that they had sustained damages due to the other party's breach of the contract."  Harding v. Naseman, 2009 WL 1953041 (S.D.N.Y. July 8, 2009) aff'd, 377 F. App'x. 48 (2d Cir.

2010); see also Wharton v. Duke Realty, 467 F. Supp. 2d 381, 393 (S.D.N.Y. 2006) ("In New York, the elements of a breach of contract claim are: (1) the existence of contract; (2) performance by the party seeking recovery; (3) non-performance by the other party, and (4) damages attributable to the breach.").  Defendants argue that the plaintiffs' claim should be dismissed because they fail to satisfy this requirement since they have not, and cannot show that the adoption of these "reasonable commercial efforts" would have been able to overcome the credit collapse and the coinciding deterioration of the market for asset-backed securities.

In support of their argument, defendants seek to analogize the case at hand to several securities fraud cases in which the court dismissed the plaintiffs' claims in part because the plaintiffs failed to establish "loss causation."  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005); Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co., 652 F. Supp. 2d 576 (E.D. Pa. 2009).  In both of these cases, the courts cited a precipitous decline in the market as evidence diminishing the inference of a causal nexus between the defendants' alleged fraudulent statements and the plaintiffs' losses.  See Lentell 396 F.3d 161, 174 ("[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.  However, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.") (alterations in original) (internal citations omitted) (internal quotation marks omitted); Luminent, 652 F. Supp. 2d at 593.

However, neither of these cases are controlling in the matter currently before the

13

court.  Not only do they address a different cause of action entirely, but in both cases, the issue of loss causation was resolved in favor of the defendants because the plaintiffs failed to plead facts with sufficient particularity to establish loss causation under the heightened pleading standard demanded by Fed. R. Civ. P. 9(b).  See Lentell, 396 F.3d at 168; Luminent, 652 F. Supp. 2d at 584.  By contrast, in the case at hand, plaintiffs' pleadings must only provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 129 S. Ct. at 1949 (articulating the lower pleading standard under Fed. R. Civ. P. (8)(a)(2)) (internal quotation marks omitted) (quoting Bell Atlantic, 550 U.S. at 570).  Plaintiffs have met this Fed. R. Civ. P. 8 requirement.  Plaintiffs' complaint alleges that defendants' failure to market the CLO led to the failure of the transaction to close and ultimately to plaintiffs' losses.  If proven true, these factual allegations would show that their losses were caused by the alleged wrongdoing rather than the collapse of the market alone. While defendants' cited cases offer an interesting illustration of how courts have addressed claims under similar circumstances and highlight the difficult road that plaintiffs must now forge in proving their claim, the plausibility standard "does not impose a probability requirement at the pleading stage."  Bell Atlantic, 550 U.S. at 556. Rather, "a well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely."  Id.  (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (internal quotation marks omitted)).

Plaintiffs have stated a plausible claim for breach of contract of the Letter Agreements.  Defendants' motion to dismiss this aspect of the plaintiffs' claim is denied.[1]

C.      Engagement Agreement

---

[1] Plaintiffs offer two additional theories for how the defendants failed "to use all reasonable commercial efforts to complete the Offering . . . ." Plaintiffs allege that the defendants failed to close the transaction when offered incentives to close by the collateral manager in the form of a decreased Warehouse Management Fee, (Compl. ¶ 73), and that the defendants refused to close the transaction as a general matter. (Compl. ¶ 24). Since, plaintiffs have stated a plausible claim for breach of contract based on the allegation that defendants breached through their failure to market the CLO, the court declines to address these additional theories.

14

Plaintiffs allege that defendants also breached their promise to purchase the Acadia CLO's senior tranches, which was memorialized in the restated Engagement Agreement of November 16, 2007.   The Engagement Agreement, entered into between Avenue Capital, Miller & Jacobs (M&J), and UBS Securities for the purpose of engaging UBS as an adviser to certain equity investors identified by M&J and Acadia CLO, provides that:

> Subject to the conditions precedent in Section 4 [], in the event that UBS has not placed the total aggregated amount of the senior-most tranche of securities in right of payment (to be rated "Aaa" by Moody's Investors Service Inc. and "AAA" by Standard & Poor's Rating Services) representing between 60%-75% of the capital structure ("Senior AAA Tranche) on or before the Closing Date for an all-in spread equal to or lower than a per annum rate equal to (a) LIBOR plus (b) 70 basis points, UBS commits to purchase from the Issuer on the Closing Date such Senior AAA Tranche . . . .

(Ex. J at § 6.)

In support of their claim, plaintiffs argue both that they are third-party beneficiaries of this agreement, or in the alternative, that under New York law, whether a party is a third-party beneficiary is an issue of fact.   With regard to their first argument, plaintiffs maintain that closing the transaction would have resulted in the Funds being reimbursed their escrow deposit which would have directly benefited them by allowing them to realize the potential for investment gains that they had been promised.   Plaintiffs further allege that the defendants knew that they were operating with the plaintiffs' money when deciding whether to close the CLO, making the Funds the direct beneficiary of the defendants' promise to sell interests in the CLO and purchase whatever portions of the senior most tranche that remained.

Under New York law, "[a] non-party may sue for breach of contract only if it is an intended, and not a mere incidental, beneficiary . . . ." <u>E. Coast Athletic Club, Inc. v. Chicago Title Ins. Co.</u>, 833 N.Y.S.2d 585, 588 (App. Div. 2007).   A party is an intended beneficiary only where "no one other than the third party can recover if the promisor

breaches the contract or the contract language . . . otherwise clearly evidence[s] an intent to permit enforcement by the third party." Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 173 (S.D.N.Y. 2009) (internal quotation marks omitted).

Based on the language of the Engagement Agreement, plaintiffs fail to meet either of these tests.  The Engagement Agreement expressly states that "this Agreement does not obligate UBS [Securities], [Avenue Capital] or M&J to take any action or create or incur any obligation or liability except as may otherwise be expressly specified herein," (Ex. J at § 1), and that "[n]o party's rights . . . under this Agreement may be assigned and/or assumed by any other person without the written agreement of the other party hereto." (Ex. J at § 16).

Plaintiffs further fail to meet the requirements of their own articulation of New York law pertaining to third-party beneficiaries.  The Restatement (Second) of Contracts § 302 provides that:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> (a)     the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> (b)     the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302 (1979).  Plaintiffs argue that they are intended third-party beneficiaries under this articulation since closure of the transaction would have resulted in a direct benefit to them through the return of their escrow deposits.

However, it is neither expressly stated nor apparent from the contract's language that it was the intent of UBS Securities, Avenue Capital, or M&J, as parties to the Engagement Agreement, to benefit the plaintiffs.  In the Engagement Agreement, UBS Securities was retained by the Avenue Capital (Collateral Manager) and M&J (Predecessor

16

Collateral Manager) to be an advisor in developing the Acadia CLO and to act as the placement agent for securities in the collateral not purchased by the Equity Investors (the Systems). (Ex. J § 2). As part of this Agreement, UBS Securities promised to purchase the "senior AAA tranche" of securities not otherwise sold. (Ex. J § 6). This promise however, does not indicate that finding "a right to performance in the plaintiffs is appropriate to effectuate the intention of the parties," that "performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary," or that "circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." See Restatement (Second) of Contracts § 302 (1979).

Further, plaintiffs' cited case in support of their argument is inapplicable to the case at hand. In Levin v. Tiber Holding Corp., 277 F.3d 243, 249 (2d Cir. 2002), the plaintiff was specifically made a beneficiary of the agreement and the promise was performed directly to the plaintiff. In the case at hand, not only were plaintiffs not express beneficiaries of the contract, but had UBS Securities purchased the "senior AAA tranche," the benefit to the plaintiffs would have been tangential rather than direct. While purchase of the senior most tranche would have drawn the transaction closer to completion, return of the plaintiffs' escrow funds was not a guarantee. Rather, as stated in the Risk Sharing Agreement, plaintiffs would only have been returned the money remaining in their escrow account after UBS had been paid pursuant to the Warehouse Agreement and the equity securities had been purchased. (Ex. I § 1). As the Engagement Agreement creates no obligation in the defendants to return plaintiffs' escrow funds, the release of this money would have merely been incidental to the defendants' purchase of the "senior AAA tranche." While the purchase of this tranche would have helped to make the closure of the Acadia CLO possible, plaintiffs confuse direct performance with what would have been just one in a

17

number of steps toward closing the Acadia CLO and allowing plaintiffs, along with the other investors, the opportunity to recoup a portion of their investment.

Plaintiffs also argue that they are intended third-party beneficiaries of the defendants' obligation to purchase the unsold portions of the "senior AAA tranche" as memorialized in the November 17, 2007 Engagement Agreement because this promise was meant to induce plaintiffs not to transfer their investment to Morgan Stanley. (Comp. ¶ 70). However, the court finds no indication from the language of any of the contracts that plaintiffs were contractually permitted to execute such a transfer. On the contrary, the Letter Agreements provide that:

> Unless otherwise extended in writing by the mutual agreement of the parties hereto, the term of this agreement . . . will terminate on the earliest of (i) the date of termination of the Warehouse Agreement (as defined below), (ii) any earlier date mutually agreed upon by the parties hereto in writing and (iii) the date on which the Transaction closes . . . .

(Ex. B & G § 2). Plaintiffs have not shown or argued that any of these conditions were met on or before November 17, 2007, which would have allowed them to terminate the Letter Agreements and transfer their investment to another financial services firm. A claim that plaintiffs are intended third-party beneficiaries to the Engagement Agreement because it was meant to induce them not to make such a transfer is therefore implausible.

In support of their second argument, that a determination of third-party beneficiary status is a factual issue inappropriate for consideration at this stage, plaintiffs cite Oost-Lievense v. N. American Consortium, P.C. 969 F. Supp. 874, 879 (S.D.N.Y. 1997) for the proposition that "[t]he resolution of plaintiff's [third-party beneficiary] status is, ultimately, a question of fact for the jury to decide." Id. Oost-Lievense however, involved a contract that specifically mentioned the plaintiff on four separate occasions, raising questions about the parties' intent. Id. The contract at issue in this case does not raise similar concerns.

18

"A third-party beneficiary claim may be dismissed where the contract rules out any intent to benefit the claimant, or where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant."  Underdog Trucking, LLC, Reggie Anders v. Verizon Services Corp., 2010 WL 2900048, at *4 (S.D.N.Y. July 20, 2010) (quoting Subaru Distrib. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124 (2d Cir. 2005) (internal quotation marks omitted)). As this is also the case here, plaintiffs' breach of contract claim based on defendants' alleged breach of the Engagement Agreement is dismissed.[2]

The implied covenant of good faith and fair dealing is found in every contract that makes a party's performance a matter of its own discretion.  See Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) ("[N]either party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.") (citations omitted) (internal quotations marks omitted)).  Plaintiffs allege that defendants breached their obligation to act in good faith through their failure to "use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner."  (Comp. ¶ 112). Plaintiffs further point to numerous portions of other agreements that they allege create a duty of good faith and fair dealing. (Ex. K at § 2(d); Ex. F, Ex. J at § 5(viii)).

   D.   Good Faith and Fair Dealing

First, like plaintiffs' claim for breach of contract of the Engagement Agreement, plaintiffs may not state a claim for breach of good faith arising out of agreements to which they were neither parties nor third-party beneficiaries. See Am.-European Art Associates,

_____

[2] Since the court finds that the plaintiffs are not third-party beneficiaries to the Engagement Agreement, the court declines to address the defendants' assertion that no breach of the Engagement Agreement could have occurred since the numerous conditions precedent to an obligation for UBS Securities to purchase the "senior AAA tranche" had not been met.

Inc. v. Trend Galleries, Inc., 641 N.Y.S.2d 835, 836 (N.Y. App. Div. 1996). The court further observes that while plaintiffs reference agreements other than the Letter Agreements to establish that defendants had a duty to act in good faith, plaintiffs have not alleged any breach of good faith as it pertains to these agreements.  Instead, plaintiffs allege, both in their complaint and Response in Opposition, only a breach of good faith for failure to "use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner" as promised in the Letter Agreements.  Given that plaintiffs have not brought claims of breach of good faith with regard to the Engagement Agreement, Warehouse Agreement, Risk Sharing Agreement, Omnibus Amendment No. 1 to the Warehouse Agreement, or any agreement other than the Letter Agreements, and that they lack privity to do so with regard to those agreements to which they were not a party or third-party beneficiary, all such claims are dismissed.

Second, plaintiffs' claim of breach of good faith and fair dealing is duplicative of their underlying contract claim.  See, e.g., Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002)("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); ARI & Co., Inc. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) ("This Court has consistently dismissed claims for breach of the implied covenant of good faith as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract.") (internal quotation marks omitted) (quoting TVT Records v. Island Def Jam Music Grp., 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003)).

Plaintiffs may not maintain both causes of action for breach of contract and breach of implied covenant of good faith and fair dealing where both claims are based on the same sets of facts.  See Underdog Trucking, 2010 WL 2900048.  However, plaintiffs' complaint

makes it clear that this is exactly what they have sought to do.  (Comp. ¶¶ 110-12).  As a result, plaintiffs' claim of breach of the implied covenant of good faith and fair dealing is dismissed.

III.  Unjust Enrichment

Plaintiffs' unjust enrichment claim asserts that defendants induced plaintiffs into making $20 million first-loss escrow deposits to invest in the Acadia CLO (Comp. ¶ 125), defendants liquidated the CLO in bad faith, and defendants used plaintiffs' deposits to cover their losses (Comp. ¶ 126).  Yet plaintiffs acknowledge that their decision "to become Equity Investors in the CLO" was the subject of their Letter Agreements with UBS Securities.  (Comp. ¶¶ 54, 55).

Fed. R. Civ. P. 8(d)(3) provides that a party may state as many separate claims as it has, regardless of consistency.  However, pursuant to New York law, where the complaint concedes the existence of valid contracts governing the subject matter of the dispute, the unjust enrichment claim will be dismissed.  See Hoeffner v. Orrick, Herrington & Sutcliffe LLP, 878 N.Y.S.2d 717, 719 (App. Div. 2009) (dismissing plaintiff's unjust enrichment claim as "duplicative of his breach of contract claim, since he allege[d] no duty owed him by defendants independent of the contract").

Because the court has concluded that plaintiffs may pursue their breach of contract claim against UBS Securities, arising out of the Letter Agreements, plaintiffs cannot also maintain a claim for unjust enrichment against that defendant.  Plaintiffs may still pursue their claim of unjust enrichment against UBS AG.  Count VII alleging unjust enrichment is dismissed as to UBS Securities only.

IV.  Tort Claims - Fraud, Silent Fraud, Negligent Misrepresentation

To state a claim for fraud or silent fraud, plaintiffs must prove (1) a misrepresentation, or a material omission of fact, (2) which was false and known to be

false by defendant, (3) that the misrepresentation or omission was made for the

purpose of inducing the other party to rely upon it, (4) justifiable reliance, and (5) injury.

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 420-21 (N.Y. 1996).  For silent

fraud, plaintiff must prove the additional element that defendants had a legal duty to

disclose the material omission of fact.  See Spencer v. Green, 842 N.Y.S.2d 445, 446

(App. Div. 2007).

> To state a claim for negligent misrepresentation, plaintiffs must demonstrate that:
>
> (1) the defendant had a duty, as a result of a special relationship, to give
> correct information; (2) the defendant made a false representation that he
> or she should have known was incorrect; (3) the information supplied in
> the representation was known by the defendant to be desired by the
> plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon
> it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Hydro Investos, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000).

   A.  Duty of Care

      1.  Silent Fraud

To support a claim of silent fraud, in addition to the elements of fraud, plaintiffs

must show that defendants had a legal duty to disclose the allegedly hidden information.

See Spencer, 842 N.Y.S.2d at 446.  A duty to disclose under New York law "ordinarily

arises where the parties are in a fiduciary or other relationship signifying a heightened

level of trust."  Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d

1478, 1483 (2d Cir. 1995).  As previously discussed, there is no fiduciary duty owed by

defendants to plaintiffs in this case.

However, plaintiffs allege that defendants possessed a superior knowledge of the

creditworthiness of asset-backed securities and the saleability of CLOs, which was

unavailable to plaintiffs, and defendants knew that plaintiffs acted on the basis of

mistaken knowledge.  Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A., 731

F.2d 112, 123 (2d Cir. 1984)(applying New York law).  Plaintiffs generally allege that in early 2007 defendants knew that the credit markets, the ratings of loans and asset-backed securities, and the residential housing market were in a precarious state, and that a collapse in any one of these would materially and adversely impact the market for commercial loans and CLOs.  As a result, UBS began divesting itself of any interests in asset-backed securities, while fraudulently inducing plaintiffs to purchase those interests.  (Comp. ¶¶ 17, 52-53).

The timeline of events lends support to plaintiffs' position.  The fact is that plaintiffs entered the Escrow Agreements and made their escrow deposits on or about January 12, 2007, allegedly induced in part by defendants' promise to purchase the senior tranche if all other tranches were placed, while UBS allegedly began a policy of divesting in asset-backed securities during this same timeframe.  (Comp. at ¶¶ 52-53).[3] Another alleged inducement was the expected return on plaintiffs' investment, which was also belied by their alleged knowledge of both the markets and their own

---

[3]     There is some lack of clarity in plaintiffs' allegations because the complaint alleges a promise to purchase the senior tranche as an inducement as early as December 2006, and as a written inducement to execute the renewed Letter Agreements in November 2007.  Compare paragraphs 53 and 70 of the complaint.

52.     In fact, in early 2007, the Defendants were dumping - rather than purchasing - asset-backed securities.  According to internal email correspondence, UBS was aware in January/February 2007 of 'dislocation' in the financial markets, and the need of its sales staff to make 'risk reducing trades,' i.e., to move asset-backed securities, its 'top priority.'

53.     The Defendants declined to disclose these material facts to Plaintiffs.  As a result of Defendant's omissions of material fact, and in reliance on the misrepresentations elaborated above, including Defendants' promise to purchase at market rates the senior tranche of AAA securities (70% of the transaction size), the PFRS approved an investment of $20 million in the Acadia CLO on December 21, 2006, and the GRS approved an investment in the same amount on January 10, 2007.

70.     On November 16, 2007, to induce Plaintiffs not to transfer the warehouse to Morgan Stanley, the Defendants represented to the parties that they had the ability to close the CLO, would close the CLO, and assured the parties that if the Defendants were unable to sell the Senior AAA Tranche by closing, that they would purchase such tranches themselves.  However, Defendants knew at that time that they did not intend to purchase the Senior AAA Tranches, or to close the CLO, due to among other things UBS's policy to divest itself from further risk associated with collateralized obligations.

investment strategy as a market participant.  Finally, the complaint alleges that defendants "touted the specialized expertise of the individuals who were to manage the collateral portfolio within Acadia CLO," but that defendants' "rosy representations were inconsistent with what UBS secretly knew."  (Comp. ¶¶ 48-50).

The court finds that plaintiffs have adequately alleged that defendants owed them a duty to support their silent fraud claim.  Whether defendants breached such duty is a factual issue.

### 2.  Negligent Misrepresentation

A claim of negligent misrepresentation requires an allegation that defendants owed a duty of care under New York law to "impart correct information."  Arm's-length commercial relationships cannot alone give rise to such a duty of care.  LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate Inc., 2003 WL 1462483, at *3 (S.D.N.Y. Mar. 21, 2003).  Given that the court has already held that MPERSIA does not apply to impose a fiduciary duty on defendants, the complaint fails to allege that defendants had any relationship with plaintiffs prior to or apart from their arm's-length contractual relationship.  This was an arm's-length commercial relationship, which does not give rise to a duty of care for purposes of plaintiffs' negligent misrepresentation claim.  Plaintiffs' Count III negligent misrepresentation claim, therefore, is dismissed.

### B.  False Representation

### 1.  Ability and Willingness to Perform

In their intentional fraud count, plaintiffs allege that "Defendants made false or otherwise misleading representations to Plaintiffs regarding their ability and willingness to close the Acadia CLO and bring it to market".  (Comp. ¶ 93).  Plaintiffs contend that the assurances given by defendants were false or misleading as to their present intent to follow through, and were made with the intention of inducing plaintiffs to enter the

24

agreements.

Tort claims cannot be maintained to resolve purely commercial disputes.  Non-Linear Trading Co. V. Braddis Assocs., Inc., 675 N.Y.S.2d 5, 13 (App. Div. 1998); Banco Espirito de Investimento, S.A. v. Citibank, N.A., 2003 WL 23018888, at *14 (S.D.N.Y. Dec. 22, 2003).  "A fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, *i.e.*, when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract."  First Bank of the Americas v. Motor Car Funding, Inc., 690 N.Y.S.2d 17, 20-21 (App. Div. 1991) (citation omitted).  In order "to recover damages for tort in a contract matter, it is necessary that the plaintiff plead and prove a breach of duty distinct from, or in addition to, the breach of contract."  Non-Linear Trading Co. V. Braddis Assocs., Inc., 675 N.Y.S.2d 5, 13 (App. Div. 1998).  For example, if the plaintiff alleges that it was induced to enter the transaction based on defendant's misrepresentation of material facts, the plaintiff has stated a claim for fraud even though the same circumstances give rise to plaintiff's breach of contract claim.  First Bank of the Americas, 690 N.Y.S.2d at 21.  In addition, claims sounding in fraud or misrepresentation may not be based solely on allegations of broken promises, unfulfilled predictions, or erroneous conjectures as to future events . See Naturopathic Labs. Int'l, Inc. v. SSL Ams., Inc., 795 N.Y.S.2d 580, 581 (App. Div. 2005).

In their complaint, plaintiffs make many factual allegations intended to support their theory that defendants made representations to induce the Systems to invest in the Acadia CLO, but they did not intend to perform their duties under the contracts.  For example, plaintiffs allege that when the new Letter Agreement was entered on November 16, 2007, defendants represented that they had the ability to close the CLO and would purchase the Senior AAA Tranche itself if unable to sell it, while at the same

time UBS was pursuing a policy of divesting itself from the risk associated with collateralized obligations.  (Comp. ¶ 70).  The allegations in the complaint are sufficient to raise a plausible inference that defendants misled the Systems about their present ability and willingness to close the transaction.  See Twombly, 550 U.S. at 570.  This aspect of plaintiffs' fraud claim survives the motion to dismiss.

### 2. Projected Performance

A second aspect of plaintiffs' intentional fraud claim is that defendants misled plaintiffs as to the projected default rates and return on their investment.  (Comp. ¶ 93). Plaintiffs' silent fraud count also alleges that defendants failed to make certain disclosures regarding the safety of the Acadia CLO investment and the expected return, even though it was aware of relevant information.  Again it is alleged that these misrepresentations and omissions were made in order to induce plaintiffs to invest in the Acadia CLO.

Allegations regarding an investment's likely performance are quintessential "statements of prediction or expectation", and such allegations will not support a claim for fraud or misrepresentation.  Naturopathic Labs., 795 N.Y.S.2d at 581.  Statements concerning an investment's likelihood of closing, expected performance, or "conservative" nature are not actionable in fraud because they are statements of mere opinion or puffery.  See DH Cattle Holdings Co. v. Smith, 607 N.Y.S.2d 227, 231 (App. Div. 1994) (representation of investment's safety, received *after* the investment was made, not actionable in fraud).

However, plaintiffs' allegations of a misrepresentation or fraud arguably go beyond mere puffery in this case.  Plaintiffs allege that defendants made representations that they knew to be false when they made them.  For example, plaintiffs describe a UBS report wherein defendants acknowledged that a "fragmented

26

[credit risk] approval structure" at UBS resulted in credit risk approval decisions being made after the CLO assets had been acquired and sold to entities such as the Acadia CLO. (Comp. ¶ 46). A plausible inference can be made that UBS made representations about risk with knowledge that it had not conducted an accurate risk assessment.

An allegation regarding an investment's likely performance is a statement of prediction or expectation, and does not constitute fraud. However, a statement made with knowledge of its falsity does amount to fraud. Plaintiffs' allegations of fraud and misrepresentation regarding projected performance of the CLO investment fall into the latter category and are not subject to dismissal at this stage.

To state a claim for silent fraud, plaintiffs must allege that defendants made "a material omission of fact which was false", which was known to be false, and that defendants failed to correct such representation. Lama Holding Co., 88 N.Y.2d at 421. Defendants contend that they are not accused of making misrepresentations or omissions in 2006 at the time the contracts were entered. Rather, it was in 2007, once the defendants would have known of the market collapse, that defendants could have known that their statements or omissions regarding performance of the investment were wrong. Plaintiffs, however, allege that defendants were aware of the market downturn as they were marketing the Acadia CLO investment to plaintiffs in 2006, and they were also aware that they lacked the ability to assess and control that risk. (Comp. ¶¶ 46, 47, 50, 51).

C. Justifiable Reliance

The Letter Agreements expressly state that plaintiffs could not and would not rely on any outside representations. (Ex. G §10, H §10). The Letter Agreements "set[] forth the entire understanding of the parties. . . and cancel[ed] any prior communications,

27

understandings and agreements between the parties" (§11); and acknowledged that plaintiffs "independently, and without reliance upon any other party or any information provided by any other party or any of its affiliates . . . made [their] own analysis and decision to enter into [the Letter Agreements] and consummate the transactions contemplated." (§10-11).  Defendants contend that in the contracts themselves, plaintiffs have admitted that they were not relying on any representations as to the very matter as to which they now claim they were defrauded.  See Danann Realty Corp. v. Harris, 5 N.Y.2d 317 (N.Y. 1959).

Plaintiffs respond to defendants' argument that an integration clause acts as a bar to establishing justifiable reliance by pointing out that an integration clause does not negate justifiable reliance on representations outside the scope of the agreement.  New York courts have held that a general merger or integration clause is "ineffective to exclude parol evidence to show fraud in inducing the contract."  Superior Technical Resources, Inc. v. Lawson Software, Inc., 17 Misc.3d 1137(A), 2007 WL 4291575, * 10 (N.Y.Sup. 2007) (citing Danann Realty Corp. supra; Sabo v. Delman, 3 N.Y.2d 155, 161 (1957)).  Courts focus on the "extent to which a merger clause was specifically negotiated by sophisticated parties using specific language or whether it was merely a general or standard clause."  Id.

The fraud alleged by plaintiffs in this case are claims made outside the contracts allegedly to induce plaintiffs to enter the agreements.  See discussion in subsections 1 and 2 of this section of the court's opinion, supra, regarding defendants' ability and willingness to perform and projected performance of the investments.  What is missing at this stage of the pleadings is any factual development surrounding the negotiation of the merger clause.  The merger clause in the Letter Agreements will be a subject of discovery, but does not result in dismissal of the fraud counts at this time.

28

Defendant's second argument against justifiable reliance is that the deteriorating state of the economy in the period leading up to plaintiffs' signing of the renewed Letter Agreements in 2007 "was a matter of public knowledge which [Plaintiffs] could have discovered through the exercise of ordinary diligence."  Auchincloss v. Allen, 621 N.Y.S.2d 305, 306 (App. Div. 1995).  Plaintiffs respond that their allegations are tailored to the "peculiar market for asset-backed securities."  Plaintiffs allege that UBS adopted as its mission statement in May 2005, the intention "[t]o be the **dominant global intermediary** in the residential mortgage and asset-backed market."  Plaintiffs' essential argument is that UBS's knowledge about the CLOs at issue in this case went far beyond the public knowledge available to plaintiffs.  See Superior Technical Resources, 2007 WL 4921575, *11 ("even a specific disclaimer of reliance is insufficient to bar a fraud claim where the facts misrepresented are 'peculiarly within the [representer]'s knowledge").  What defendants knew about the market, when they knew it, and whether their representations were at odds with their knowledge, will be the subject of discovery and presumably a future motion for summary judgment.

Finally, plaintiffs admit in the Letter Agreements that they are "sophisticated investors".  As such, it is difficult to show they were justified in relying upon defendants' allegedly false representations when plaintiffs failed to negotiate those representations into the written contracts.  See Banco Espirito, 2003 WL 23018888 at *14.  These considerations go to the issue of whether plaintiffs' reliance on defendants' representations was reasonable.  It is impossible to decide whether plaintiffs' allegations are plausible because the allegations lack specificity.  The court will allow plaintiffs, in accordance with the pleadings requirements of Fed. R. Civ. P. 9(b), to amend their complaint to aver justifiable reliance with the required level of particularity.

D. <u>Fed. R. Civ. P. 9(b) Particularity Requirement</u>

Under Fed. R. Civ. P. 9(b), fraud, silent fraud, and negligent misrepresentation claims must be stated with particularity.  Plaintiffs' complaint indiscriminately references "defendants" or "UBS", instead of apprising each of the defendants of the circumstances surrounding the fraudulent conduct which they are accused of committing.  <u>United States ex rel. Beldsoe v. Cmty. Health Sys., Inc.</u>, 342 F.3d 634, 643 (6th Cir. 2003). Defendants contend that plaintiffs must know which defendant approached them, and by whom specifically the contacts were initiated.  In response, plaintiffs point to paragraphs of their complaint which allege that misrepresentations were made by defendants through Miller & Jacobs.  (Comp. ¶¶ 37, 38).

The complaint alleges: "In April 2006, the Defendants approached PFRS, through Miller & Jacobs with a proposal for an investment of pension funds in a CLO transaction known as the Acadia CLO."  (Comp. ¶ 37).  "Subsequently, in October 2006, the Defendants made the identical proposal, through Miller & Jacobs, to the GRS.  The materials presented to both Plaintiffs were prepared by or with the authorization of the Defendants and contained materially false representations regarding the transaction, including without limitation the risk and anticipated returns associated with the CLO." (Comp. ¶ 38).

There are two immediate problems with these particular paragraphs of the complaint.  First, M&J is not a defendant, and second there are no specific allegations regarding the materials referenced in paragraph 38, including pointing out specifically which representations contained in the materials were false.

Defendants next argue that plaintiffs likewise should be able to "allege the time, place, and content of the alleged misrepresentations [or omissions] on which [they] relied."  <u>Id.</u>  However, plaintiffs' complaint does not allege <u>where</u> any of the alleged

misrepresentations or omissions were made, and with one exception they do not specifically identify the <u>time or date</u> of any alleged misrepresentations or omissions.  In paragraph 70 of the complaint, plaintiffs do allege that:

> On November 16, 2007, to induce Plaintiffs not to transfer the warehouse to Morgan Stanley, the Defendants represented to the parties that they had the ability to close the CLO, would close the CLO, and assured the parties that if the Defendants were unable to sell the Senior AAA Tranche by closing, that they would purchase such tranches themselves. . . .

Defendants point out that, although the allegation includes a specific date, it fails to allege where, by whom, or to whom the alleged misrepresentation was made.  Other allegations reference entire months, such as April 2006 or October 2006.  (Comp. ¶¶ 37, 38, 44).  Plaintiffs contend that they do have more details they can add if the court grants them leave to amend their complaint.  (See brief, pg. 25, footnotes 20, 21).  The court agrees with defendants that it is reasonable to require plaintiffs to identify the specific misrepresentations that form the basis of their claims, how and when they were made, and by whom they were made.  Therefore, the court will permit plaintiffs the opportunity to amend their remaining fraud counts in order to comply with Fed. R. Civ. P. 9(b).

VII.  Accounting

Plaintiffs' claim for an accounting is dismissed because the court has concluded that defendants did not owe plaintiffs a fiduciary duty.  See e.g., Akkaya v. Prime Time Transp., Inc., 845 N.Y.S.2d 827, 828 (App. Div. 2007) ("The right to an accounting rests on the existence of a trust or fiduciary relationship regarding the subject matter of the controversy at issue.").

VIII.  UBS Investment Bank Improper Defendant

Defendants argue that because defendant UBS Investment Bank is an unincorporated division of UBS AG, it is not a separate entity capable of being sued.

31

<u>Sheldon v. Kimberley-Clark Corp.</u>, 490 N.Y.S.2d 810, 811 (App. Div. 1985). Plaintiffs appear to concede this argument as they do not respond to it in their response brief. Defendant UBS Investment Bank is therefore dismissed from the complaint.

CONCLUSION

For the reasons stated in this opinion and order, defendants' motion to dismiss is GRANTED as to Counts I (Michigan duty of care and loyalty); III (negligent misrepresentation); V (breach of contract) as to the Engagement Agreement and implied covenant of good faith and fair dealing only; VI (MPERSIA); VII (unjust enrichment) as to UBS Securities only; and VIII (accounting). Plaintiffs shall have 21 days from the date of this order to amend their fraud claims to plead same with particularity.


Dated: June 30, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 30, 2011, by electronic and/or ordinary mail.

S/Marcia Beauchemin
Deputy Clerk

---