UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL RETIREMENT SYSTEM
OF THE CITY OF DETROIT, and
POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,

        Plaintiffs,

vs.

Case No. 10-CV-13920
HON. GEORGE CARAM STEEH

UBS, AG and UBS SECURITIES, LLC,

        Defendants.
_____/

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT [DOC. 45]

Plaintiffs are the General Retirement System of the City of Detroit ("GRS") and the Police and Fire Retirement System of the City of Detroit ("PFRS") (collectively, the "Systems"). The Systems are pension plans established by the Charter and Municipal Code of the City of Detroit. The Systems filed this action against UBS Securities, LLC, UBS AG, and UBS Investment Bank, alleging that the UBS defendants fraudulently induced the Systems into buying an equity position in a collateralized loan obligation ("CLO"), and for breaches of their fiduciary duty for improperly liquidating the securities solely for their own benefit, thereby depriving the Systems of their investment.

In its June 30, 2011 Order, the court dismissed plaintiffs' claims for breach of fiduciary duty under common law and MPERSIA, negligent misrepresentation, breach of contract as to the Letter Agreements (against UBS AG), breach of contract as to the Engagement Agreement, breach of the implied covenant of good faith and fair dealing,

unjust enrichment (against UBS Securities), and accounting. The court directed plaintiffs to amend their complaint to plead their intentional fraud and silent fraud claims with the level of particularity required by Fed. R. Civ. P. 9(b). The court instructed plaintiffs to identify the "specific misrepresentations that form the basis of their claims, how and when they were made, and by whom they were made". (Order, p. 31). On August 4, 2011, plaintiffs filed their First Amended Complaint and Jury Demand.

The matter is before the court on defendants' motion to dismiss the amended complaint.

## LEGAL STANDARDS

I. Motion to Dismiss

Rule 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. Under the Supreme Court's articulation of the Rule 12(b)(6) standard in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 554-56 (2007), the court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. "[N]aked assertions devoid of further factual enhancement" are insufficient to "state a claim to relief that is plausible on its face". Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Bell Atlantic, 550 U.S. at 555) (citations and quotations omitted). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be

enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Id. (citing Bell Atlantic, 550 U.S. at 555).

II. Fed. R. Civ. P. 9(b)

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim" made by "simple, concise, and direct allegations." Fed. R. Civ. P. 8(a). "Rule 9(b) adds additional pleading requirements for allegations of fraud or mistake, . . . reflect[ing] the rulemakers' understanding that in cases involving fraud or mistake, a 'more specific form of notice' is necessary to permit a defendant to draft a responsive pleading." United States ex rel. Snapp v. Ford Motor Co., 532 F.3d 496, 503-04 (6th Cir. 2006) (internal citations omitted). The purpose of Rule 9(b)'s special pleading requirements is to provide a defendant with sufficient notice to defend, and to provide enough specificity for the court to determine whether plaintiffs can satisfy the elements of their claims. See id. "So long as a relator pleads sufficient detail - in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud - to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." Id.

## ANALYSIS

I. Counts II and III, Fraud and Silent Fraud

To state a claim for fraud or silent fraud, plaintiffs "must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 420-21 (N.Y. 1996).

3

A. <u>Alleged Misrepresentations</u>

1. <u>April 2006 Memorandum</u>

The misrepresentations that form the basis of the plaintiffs' claims are alleged in paragraphs 94-98 of the First Amended Complaint. The majority of the allegations relate to representations in the April 2006 Memorandum, and pertain to the qualifications of Portfolio Manager M&J, as well as the projected performance of the Acadia CLO. Plaintiffs allege that the April 2006 Memorandum represents that M&J would bring "specialized experience" to the proposed CLO, (Am. Compl. ¶ 95), that M&J would use diligence in reviewing potential collateral "for credit quality" and for "fit within the CLO" portfolio, (Am. Compl. ¶ 94), and that under M&J's management, the proposed CLO would adhere to a "conservative investment philosophy," (Am. Compl. ¶ 96). Regarding projections of future performance, the April 2006 Memorandum allegedly misrepresented that the Acadia CLO would generate "[a]nticipated returns of 10-15%," that "the expected IRR is 12.3% to 15.0%," and that "the CLO would perform well during all stages of the economic cycle." (Am. Compl. ¶ 96).

Plaintiffs allege the date, time and place the alleged misrepresentations were made. They allege that the misrepresentations were made by defendants, "by and through Miller and Jacobs", that defendants prepared the materials and provided them to Miller & Jacobs with the intention that they be provided to plaintiffs, and that plaintiffs understood the materials were provided by defendants.

a. <u>Consideration of Memorandum</u>

There is an issue whether the Memorandum itself be considered at the motion to dismiss stage. The Memorandum was not attached to the complaint, but defendants

attached it to their motion to dismiss. Plaintiffs contend that the amended complaint references "Presentation Materials" generally, only one of which is the Memorandum.

The Sixth Circuit case <u>Greenberg v. Life Ins. Co. Of Virginia</u>, 177 F.3d 507 (6th Cir. 1999) involved a lawsuit arising from the purchase of what was understood by plaintiffs to be a single-premium life insurance policy. Plaintiffs alleged claims of fraud, negligent misrepresentation and breach of contract, among other claims. Defendant filed a motion to dismiss for failure to state a claim upon which relief could be granted, and attached copies of the life insurance policies it had issued, as well as an illustration presented to the plaintiffs before they purchased the policies. The Sixth Circuit held that the insurance policies were not matters outside the pleadings, and the court's consideration of them did not convert the motion to dismiss into a motion for summary judgment. The insurance policies were referred to throughout the complaint, and they were central to plaintiffs' claims, each of which related to and arose from the life insurance policies in question. However, the illustration, which was a chart with projected values and benefits based on the life of the insured, was held to be a matter beyond the pleadings which should not be considered in ruling on a motion to dismiss. <u>Id.</u> at 514.

Plaintiffs' fraud claim is based in large part on statements contained in the Memorandum, which is a document presented for purposes of soliciting plaintiffs' investment. The Memorandum is not the agreement itself, but it has been made an integral document by plaintiffs' incorporation of the Memorandum into the fraud allegations in Counts II. Plaintiffs argue that there are many disputed issues surrounding the Memorandum, including the source of the information contained therein (a factual issue) and the implications of the disclaimers (a legal issue). For purposes of

5

addressing a 12(b)(6) motion to dismiss, the court need only consider whether a particular document is a matter "outside the pleadings" in order to avoid converting the motion to dismiss into a motion for summary judgment. The Memorandum is not a matter outside the pleadings, and as such, it may be considered in ruling on the pending motion to dismiss.

### b. M&J is Not a Defendant

The Amended Complaint asserts that defendants actually prepared the materials contained in the 2006 Memorandum, which was given to plaintiffs by M&J. Defendants argue that the Memorandum itself states that the representations contained in the "Collateral Manager" section come from the Collateral Manager, M&J. A disclaimer further provides that UBS was not the source of any information in the "Collateral Manager" section. According to defendants, if any of the representations were false, the responsible party would be M&J, not defendants.

The question of who actually wrote the statements, or who provided the information in the Memorandum, is a factual defense for defendants. "UBS" is stamped on virtually every page of the Memorandum, which is sufficient to support plaintiffs' allegation that defendants prepared or authorized the Memorandum and other presentation materials. A complaint is read "as a whole" to determine compliance with Rule 9(b). See Brown v. Bank of New York Mellon, 2011 WL 206124, at *4 (W.D. Mich. Jan 21, 2011). While certain representations are attributed directly to M&J, overall the complaint alleges that defendants represented they would adequately manage the CLO's risk, in part by employing expert outside risk analysts.

Plaintiffs have sufficiently alleged that defendants are behind the representations that form the basis of their fraud claims.

### c. Statements Regarding Projected Performance

The Amended Complaint alleges that defendants represented anticipated returns of 10-15%. (Am. Compl. ¶ 96). This representation comes from the April 2006 Memorandum ("Anticipated returns are 10-15% on an IRR basis after conservative estimates of defaults and losses."). April 2006 Memorandum, p.6. A footnote at the end of that statement contains this disclaimer:

> IRR returns are based on assumptions used in the Illustrative Scenarios set forth herein. Please refer to the Material Modeling Assumptions section. Such assumptions are unlikely to be consistent with actual experience. Actual events may differ materially from those assumed. No assurances can be given as to actual investment performance.

April 2006 Memorandum, p.6, n.3. There are similar disclaimers and qualifications throughout the April 2006 Memorandum, including an entire section entitled "Disclaimers," which includes the following statement in bold type:

> **The information contained herein is illustrative and is not intended to predict actual results. There can be no assurance that the Preference Shares referenced herein will actually perform as described in any scenario presented. . . .**

April 2006 Memorandum, p. 2. A reasonable person could not read the heavily qualified statements in the memorandum and conclude that defendants represented that the Acadia CLO would generate a specific rate of return, as alleged in the amended complaint.

The Amended Complaint further alleges that defendants represented that "the CLO would perform well during all stages of the economic cycle." (Am. Compl. ¶ 96). In a section entitled "Leveraged Loan Market Overview", the April 2006 Memorandum provides graphs with the following caption: "While performance in other asset classes has been heavily dependent on proper timing, bank loans have produced solid, steady

returns during each stage of the economic cycle." (April 2006 Memorandum, p. 40). The accompanying graphs show past performance of leveraged loans in different years and various market cycles, including the Russian debt crises of 1998, the tech bubble burst and stock market collapse of 2001, the high default rate environment of 2002, and the low interest rate environment of 2004. The graphs are from public sources, and they indeed show a positive return on leveraged loans historically compared to the S&P 500, high yield bonds, and hedge funds.

True statements regarding historical performance of bank loans as a class cannot serve as the basis for a fraud claim regarding the Acadia CLO specifically. One cannot reasonably conclude that defendants in this case represented the Acadia CLO would generate a specific rate of return and would perform well during all stages of the economic cycle, as alleged in the amended complaint at paragraph 96. See Feasby v. Industri-Matematik Int'l Corp., 2000 WL 977673, at *4 (S.D.N.Y. July 17, 2000) ("Plaintiffs cannot prevail by using crystal balls or 20/20 hindsight any more than on conclusory generalizations or speculation, but must allege facts that give rise to a strong inference of fraudulent intent." (quotations omitted)).

### d. No Allegation that Representations were False when Made

To plead a cause of action for fraudulent inducement, the plaintiff must allege that the defendant knew its representation was false when made, and such allegation must be supported by factual allegations in the complaint. Banco Espirito Santo de Investimento v. Citibank, N.A., 2003 WL 23018888, * 13 (S.D.N.Y. 2003). Plaintiffs allege generally that "Defendants' representations regarding its ability to assess and control risk were untrue, and known to be untrue, by UBS." (Am. Compl. ¶ 99). Plaintiffs then give an example of this knowledge:

> Defendants have since acknowledged that a "fragmented [credit risk] approval structure" at UBS resulted in credit risk approval decisions being made after the CDO/CLO assets had been acquired and sold to special purpose entities, such as the Acadio CLO. Their own Report further cited an "absence of risk management," "incomplete risk control methodologies," and "misincentives" that arose from the CDO/CLO origination and purchasing desks sharing the same reporting lines.

(Id., see also ¶ 46). There is no allegation, let alone facts to support an allegation, that UBS knew its representations regarding its ability to assess and control risk were known by UBS to be untrue when they were made in April 2006.

> Regarding the nature of the risk, plaintiffs allege in the amended complaint: Defendants' representations regarding the conservative nature of the risk were also untrue, and known to be untrue by Defendants, because Defendants secretly knew, unknown to the market at large, that the asset backed security market was deteriorating, causing Defendants to divest themselves of these securities in order to reduce the risk levels on its balance sheet.

(Am. Compl. ¶ 100, see also ¶ 47). There are no facts alleged supporting a reasonable inference of knowledge and intent on the part of defendants at the time the alleged misrepresentations were made in April of 2006.

Under Fed. R. Civ. P. 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity." Although knowledge may be averred generally, a plaintiff must "allege circumstances that give rise to a strong inference that the defendants knew the statements to be false," even where the plaintiff "has adequately identified the statements alleged to be misrepresentations and properly indicated when, where and by whom they were made." Banco Espirito, 2003 WL at * 12 (citing Wexner v. First Manhattan Co., 902 F.2d 169, 173 (2d Cir. 1990)). Plaintiffs here have failed to allege facts to support an inference that UBS knew in April 2006 that the alleged misrepresentations contained in the April 2006 Memorandum were false. See O'Brien v. Price Waterhouse, 740 F.Supp. 276, 281 (S.D.N.Y. 1990) ("Allegations of fraud

9

relating to speculative projections must allege particular facts demonstrating the knowledge of defendants at the time that such statements were false.").

### 2. 2007 Representations

Plaintiffs allege that they agreed to keep the warehouse with defendants in October 2007 only after defendants orally represented that they were able and willing to close the CLO. (Am. Compl. ¶ 105). The oral representations were allegedly made by Timothy LeRoux from UBSS the first week of October 2007, in a telephone conference call with Jeffrey Miller and Tammy Dalton from M&J, and representatives of plaintiffs. Id. Similar representations were made by Mr. LeRoux and Declan Ryan during phone calls to a meeting of the GRS Board on October 10, 2007 and the PFRS Board on October 11, 2007. Id. Plaintiffs allege that defendants also represented in the November 16, 2007 Engagement Agreement that they had the ability to close the CLO, would close the CLO, and that if the defendants were unable to sell the Senior AAA Tranche by closing, that they would purchase such tranches themselves. (Am. Compl. ¶ 106). Defendants are alleged to have had secret knowledge about the CLO market's distress at the time they promised to close the equity tranches, and actually intended to divest themselves of risky loans by dumping them into the Acadia CLO. (Am. Compl. ¶ 107). Finally, plaintiffs relied on these misrepresentations in remaining with defendants, and refrained from transferring the warehouse away from defendants, to Morgan Stanley, based on defendants' misrepresentations. (Am. Compl. ¶ 108).

#### a. Right to Transfer Warehouse in 2007

The court previously noted that it found "no indication from the language of any of the contracts that plaintiffs were contractually permitted to execute such a transfer." (Order, p. 18). In the Omnibus Amendment No. 1, dated September 13, 2007, the

parties agreed that a "Sale Trigger Event" had occurred and the effect was to give UBS AG the right to sell any loan in the warehouse. Plaintiffs characterize the situation in the amended complaint as follows:

> Subsequent to the funding of the Acadia CLO, and during the summer of 2007, Plaintiffs grew concerned that Defendants lacked the ability and willingness to close the transaction as promised in the letter agreements. In fact, during this period, Defendants issued a notice of termination of the warehouse. By September 2007, Plaintiffs and Miller & Jacobs were negotiating with prospective replacement warehouse lenders such as Morgan Stanley Bank and Bank of America. Under the circumstances, with Defendants having issued a notice of termination of the warehouse, **Plaintiffs had the right and ability to transfer to a different warehouse lender, and could have in fact done so**; had they done so, they would have avoided the loss that they suffered by ultimately remaining with Defendants.

(Am. Compl. ¶ 104; emphasis added). Plaintiffs do not provide any factual support for this allegation, either in the amended complaint or in opposition to defendants' motion to dismiss.

The Warehouse Agreement, to which plaintiffs were neither parties nor third-party beneficiaries, gave defendants the right to sell any loan in the warehouse when a Sale Trigger Event had occurred. However, a Sale Trigger Event did not permit *plaintiffs* to transfer the warehouse facility to another financial institution. Plaintiffs' claims for fraud and silent fraud based on the October and November 2007 representations fail because plaintiffs had no right to do that which they claim they were induced to do – forebear from moving the warehouse facility to another financial institution. See Perrotti v. Becker, Glynn, Melamed & Muffy LLP, 918 N.Y.S.2d 423, 427 (App. Div. 2011) ("This Court has repeatedly held that a party claiming fraudulent inducement cannot be said to have justifiably relied on a representation when that very representation is negated by the terms of a contract executed by the allegedly

11

defrauded party."); A-Pix, Inc. v. SGE Entm't Corp., 635 N.Y.S.2d 638, 640 (App. Div. 1995) (directing trial court to dismiss fraud claim based on oral representations, alleged to be false when made, that film would cost no more than an additional $750,000 to complete because counterclaim plaintiff could not reasonably have relied on such statements where "[t]he contracts specifically contemplated and addressed cost over-runs").

### b. November 16, 2007 Engagement Agreement

Paragraph 106 of the amended complaint alleges that "[o]n November 16, 2007, to induce Plaintiffs not to transfer the warehouse to Morgan Stanley, the Defendants represented to the parties" in the written Engagement Agreement (1) "that they had the ability to close the CLO," (2) that they "would close the CLO," and (3) they "assured the parties that if the Defendants were unable to sell the Senior AAA Tranche by closing, that they would purchase such tranches themselves."

Defendants contend that the Engagement Agreement, to which plaintiffs were not parties, does not contain a representation that defendants definitively would close the CLO. Rather, the Engagement Agreement contains a list of fifteen specific conditions precedent that must occur before the CLO could close. Therefore, the Engagement Agreement does not contain a representation that defendants had the ability to, or in fact would, close the CLO. The third assurance, that if defendants were unable to sell the Senior AAA Tranche by closing they would purchase such tranches themselves, was subject to the same fifteen conditions precedent, plus three additional conditions. The additional conditions were: (1) Moody's providing a rating of "Aaa" to the securities; (2) Standard & Poor's providing a "AAA" rating to the securities; and (3) UBSS successfully placing the rest of the securities on terms acceptable to it. Engagement

Agreement § 6. Given all of the conditions that had to occur, the Engagement Agreement could not reasonably have been read by plaintiffs as a representation that defendants would close the CLO, and would purchase the senior tranches if necessary in order to close the CLO.

The court previously held that plaintiffs were neither parties to, nor third-party beneficiaries of, the Engagement Agreement. Therefore, any representations made by defendants in the Engagement Agreement were not made to plaintiffs, with the intent that plaintiffs rely on such representations. Plaintiffs' claims for fraud or silent fraud based on the Engagement Agreement are dismissed.

### B. Alleged Material Omissions

In Count III, plaintiffs allege that "Defendants failed to disclose to Plaintiffs that a substantial number of their own high-risk commercial loans were going to be dumped into the Acadia CLO portfolio, and that Plaintiffs' loss resulting from a failure to close the CLO would be Defendants' gain." (Am. Compl. 114, 118). Plaintiffs' other alleged omissions are that defendants had "detected serious problems in the market for CLOs", "that they were engaged in an effort to divest themselves of commercial loan investments," and that they "did not intend to bring the Acadia CLO to market." (Am. Compl. 113, 118). The court did not previously dismiss plaintiffs' silent fraud claim, and instead gave plaintiffs the opportunity to amend to plead their claim with more specificity.

The amended complaint does not identify which of defendants' high-risk loans were "dumped" into the Acadia CLO, when the decision to "dump" was made, or who made the decision. Neither are there factual allegations to support the theory that defendants were aware of "serious problems in the market for CLOs" particularly, as

13

opposed to problems in the market for subprime mortgages, for example. The timing of such knowledge is critical, but is also lacking in the amended complaint. Finally, the plausibility of plaintiffs' theory in Count III is questionable where the Collateral Manager, not the defendants, selected the loans for the Acadia CLO portfolio under criteria set forth in the Warehouse Agreement.

Plaintiffs have failed to plead their claim of silent fraud with the required amount of specificity.

C. <u>Justifiable Reliance</u>

The court explained in its Order that it was "impossible to decide whether plaintiffs' allegations [of reliance] are plausible because the allegations lack specificity," and therefore the court "allow[ed] plaintiffs, in accordance with the pleading requirements of Fed. R. Civ. P. 9(b), to amend their complaint to aver justifiable reliance with the required level of particularity." (Order, p. 29).

In the amended complaint, plaintiffs allege that they "reasonably and justifiably relied on the representations of Defendants because of their . . . sophistication in global financial markets generally and the CLO market specifically . . . ." (Am. Compl. 103). "Plaintiffs reasonably and justifiably relied on Defendants' representations" because "Defendants had generally held themselves out as the 'dominant global intermediary'. . . ." (Am. Compl. 109). In addition to defendants' sophistication, plaintiffs relied on their representations because of "the unique nature of the CLO". (Am. Compl. 103). Finally, plaintiffs allege their reliance was justified because of "Defendants' representations that they would utilize sufficient experience and expertise to ramp up the CLO for ultimate closing, and the fact that Defendants promised to close the transaction in the letter agreements." (Am. Compl. 103, also 109).

14

In multiple agreements, plaintiffs acknowledge that they are sophisticated investors. (2006 Letter Agreements, § 11; Risk Sharing Agreement, § 4.1; Omnibus Amendment No. 1, § 6; 2007 Letter Agreements, § 11). In their Amended Complaint, plaintiffs characterize the sophisticated investor clauses as boilerplate:

> The purported merger clause and "sophisticated investor" provisions in the agreement documentation were boilerplate that was not specifically negotiated into the letter agreements by the parties; the Plaintiffs were induced to enter into the agreement by Defendants' misrepresentations, and would not have agreed to the agreement generally or the inclusion of the merger and "sophisticated investor" boilerplate specifically were it not for the misrepresentations.

(Am. Compl. 103).

However, each sophisticated investor clause is contained in a section of the various agreements wherein plaintiffs represent that they are acting for their own account, that they have made their own independent decision to enter into the particular agreement, that they are capable of assessing the consequences of entering the agreement, and that they have investigated and determined the investment to be suitable under MPERSIA. See, 2006 Letter Agreements, § 11; Risk Sharing Agreement, § 4.1; Omnibus Amendment No. 1, § 6; 2007 Letter Agreements, § 11. Each of the warranty sections is customized to the particular agreement in which it appears, and as such is not boilerplate. While the plaintiffs may not rise to defendants' alleged status of dominant global intermediary for asset-backed securities, they are undeniably sophisticated investors, which is all that is required.

New York courts generally recognize that reasonable reliance is a fact-intensive issue, often making it an inappropriate basis for dismissal on the pleadings. See Thomas H. Lee Equity Fund v. L.P. v Grant Thornton LLP, 586 F.Supp.2d 119, 135 (S.D.N.Y. 2008). However, when faced with a sophisticated investor, New York courts

are reluctant to find that the investor justifiably relied on misrepresentations when a sophisticated investor "made no attempt to include [the defendant's] purported representations in any written agreement." Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., 2003 WL 23018888, at *14 (S.D.N.Y. Dec. 22, 2003). Whether reliance is justifiable is determined by "consider[ing] the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003).

The Emergent Capital court was reviewing a dismissal at the pleadings stage, also involving a second amended complaint. The securities fraud case arose out of a failed investment by plaintiff in the stock of defendant, NETV. The misrepresentations alleged by plaintiff centered on the size of NETV's largest asset. The court found that plaintiff was a sophisticated investor, based on language in the stock purchase agreement that plaintiff had "knowledge and experience in financial and business matters" and that it could readily evaluate the risks of the transaction. In addition, plaintiff "secured from defendants extensive contractual representations concerning NETV's financial condition and operations." Id. at 196.

The court was not swayed by the fact that the alleged misrepresentation was made in writing in NETV's brochure, as opposed to being made orally. Rather, the court stated that, "[t]o the contrary, the written reference to Brightstreet in NETV's brochure should have served as additional notice to appellant that this allegedly significant representation should be reflected in the contract." Id. The court affirmed the district court's dismissal of plaintiff's fraud claim for a lack of reasonable reliance. Id.

The misrepresentations alleged by plaintiffs fall into three categories: (1) defendants had the ability to monitor and control risk associated with investments in the Acadia CLO, and M&J in particular had specialized experience in controlling such risk, (2) the Acadia CLO would generate a specific return and would "perform well during all stages of the economic cycle," and (3) defendants "were committed to closing the deal, promised to market the tranches to accomplish this, and would purchase the senior tranche if necessary to close the CLO." None of these alleged misrepresentations were included in any of the written agreements between the parties.

Plaintiffs argue that the misrepresentations involve facts peculiarly within defendants' knowledge, and that no amount of due diligence would have protected plaintiffs. In addition, plaintiffs make the argument that the misrepresentations about the risk level and quality of the investment is what induced plaintiffs to participate in the CLO investment in the first place. Where the misrepresentations are made in furtherance of a fraudulent scheme, justifiable reliance is presumed. In re Monahan Ford Corp. of Flusing, 340 B.R. 1 (Bkrtcy. E.D.N.Y. 2006).

However, applying New York law, the Lazard court addressed the "peculiar knowledge" argument. The court looked at Protective's peculiar knowledge theory that "Lazard set the whole deal up in such a way that Protective had to rely on Lazard's representations and had to commit itself to purchase the MCC bank debt before it had the opportunity to examine the Scheme Report." Lazard Freres & Co. v Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997). "It would therefore appear that Protective might have been justified in relying on Lazard's alleged misrepresentations when it orally committed itself to purchase [the bank debt]." Id. The court did not draw this

17

conclusion, finding it to be "too simple". Id. Rather, the court held the sophisticated investor to a higher standard when it came to justifiable reliance:

> As a substantial and sophisticated player in the bank debt market, Protective was under a further duty to protect itself from misrepresentation. It could easily have doe so by insisting on an examination of the Scheme Report as a condition of closing. . . . We believe that the failure to insert such language into the contract - by itself - renders reliance on the misrepresentation unreasonable as a matter of law.

Id. (internal citations omitted).

Plaintiffs' claims of fraud and silent fraud are dismissed for failure to plead facts that establish justified reliance where plaintiffs are recognized as sophisticated investors as a matter of law.

II. Breach of Contract

The only contract claim that survived defendants' first motion to dismiss was plaintiffs' claim that UBSS breached the 2007 Letter Agreements by failing to "use all reasonable commercial efforts to complete the Offering in a reasonably expeditious manner." In paragraph 71 of the original complaint, plaintiffs allege that UBS failed to market the CLO. The court noted that the plausible allegations in a complaint must be accepted as true when deciding a motion to dismiss, and held "it is reasonable to conclude that the parties' intended 'reasonable commercial efforts' to include some marketing of the CLO." (Order p. 12). As the complaint alleged that UBSS undertook no marketing efforts, the court held "[i]t would . . . be inappropriate to dismiss the plaintiffs' claim for breach of contract on these grounds." (Order p. 12).

Defendants contend that the amended complaint contains a shift in plaintiffs' allegations. Plaintiffs now allege that "[d]uring the first week of October 2007, Timothy LeRoux – from UBSS – represented . . . that UBS . . . would market the equity tranches in Europe, Asia, and Canada prior to the Thanksgiving Holiday." (Am. Compl. 105). However, paragraph 71 is repeated in the amended complaint. By adding paragraph 105, plaintiffs give more detailed allegations regarding a specific representation made by defendant during a marketing tour. Plaintiffs ought not be penalized for adding more detail to their amended complaint on a claim that already survived a motion to dismiss.

Therefore, plaintiffs' breach of contract claim survives defendants' motion to dismiss only as to the claim that UBSS breached the Letter Agreements for allegedly failing to use all reasonable commercial efforts to complete the offering. Plaintiffs' claims for breach of contract as to UBS AG, breach of the Engagement Agreement, and breach of the implied covenant of good faith and fair dealing have all previously been dismissed.

III. Unjust Enrichment

Unjust enrichment is a quasi-contract theory of recovery, and "is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." IDT Corp. V. Morgan Stanley, 12 N.Y.3d 132, 142 (N.Y. 2009). To successfully plead unjust enrichment, a plaintiff must show that: (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered. Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (N.Y. 2011).

Plaintiffs' unjust enrichment claim is that UBS AG induced plaintiffs to make first-loss escrow deposits for the Acadia CLO, and then liquidated the CLO in bad faith and

19

used the plaintiffs' deposits to cover their losses. Plaintiffs argue that it is against equity and good conscience to permit UBS AG to keep plaintiffs' money in order to cover its own risky investments.

The court has already found there was no contractual relationship between plaintiffs and UBS AG, so unjust enrichment is a viable claim against that defendant. Plaintiffs have adequately pled a claim of unjust enrichment to survive a motion to dismiss.

## CONCLUSION

For the reasons stated in this opinion and order, defendants' motion to dismiss is GRANTED as to fraud and silent fraud. The claims remaining in plaintiffs' first amended complaint are breach of contract (Letter Agreements) as to UBSS and unjust enrichment as to UBS AG.

Dated: April 16, 2012

> S/George Caram Steeh
> GEORGE CARAM STEEH
> UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on April 16, 2012, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---